**VAN ZUCH v. UNITED STATES.**
Civ. No. 8514.

United States District Court
E. D. New York.
Jan. 20, 1954.

Feltenstein & Rosenstein, New York City, Sidney J. Feltenstein, New York City, of counsel, for plaintiff.

Leonard P. Moore, U. S. Atty., Brooklyn, N. Y., Albert H. Buschmann, Asst. U. S. Atty., Jamaica, N. Y., Gerard M. Carey, Asst. U. S. Atty., Brooklyn, N. Y., of counsel, for defendant.

GALSTON, District Judge.

This is an action brought under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346, 2671 et seq., for damages allegedly sustained by the plaintiff while a prisoner at the Federal Correctional Institution at Danbury, Connecticut.

In January, 1947, Van Zuch was convicted of a violation of the OPA laws, for accepting rentals in excess of the ceiling allowed. Shortly thereafter he was also convicted for concealing assets in violation of the Bankruptcy laws. He was sentenced to a six months' term on each violation, the sentences to run concurrently.

The complaint alleges that while he was a patient in the prison hospital he was required to perform manual labor and to work in the kitchen of the hospital; that in June, 1947, he was required to scrub pots and pans with steel wool; that pieces of steel wool became embedded in his right thumb; and that he sustained injuries from infection, blood poisoning, osteomyelitis and osteoperosis. Damages for "injury to mind, body and health" are alleged in the sum of $50,000. The negligence of the defendant is more specifically alleged as follows:

"Twelfth

"(a) Requiring and compelling plaintiff to perform said work and labor while physically incapacited and in an unfit and unsound state of health and despite plaintiff's repeated protest to defendant, * * *.

"(b) Requiring and compelling plaintiff to use an inferior, defective, improper and dangerous grade of steel wool and in failing to provide plaintiff with gloves or hand guards.

"(c) Refusing to furnish and provide medical care and attention to plaintiff with regard to said thumb and said injury and in ignoring repeated requests by plaintiff for such medical care and attention.

"(d) Improperly, dangerously and unduly delaying the affording of medical care and attention to plaintiff in disregard of repeated requests by him for same.

"(e) Failing to provide competent, adequate, proper and timely medical care and attention.

"(f) Undertaking to furnish and provide medical care and attention and then doing so negligently, carelessly, improperly and incompetently.

"(g) Failing to take x-rays of said thumb, failing to remove pieces of steel wool and foreign substances therefrom, causing a careless and negligent operation to be performed on said thumb, failing to properly probe the same for foreign substances, improperly and carelessly suturing and bandaging the same."

The answer denies the allegations of negligence generally, alleges contributory negligence and failure to state a claim upon which relief can be granted.

The evidence discloses that the plaintiff was a mechanical and civil engineer. Upon admission to the prison at Danbury he was assigned to do drafting, and he worked in connection with the construction of small houses on the prison grounds. On May 16, 1947, plaintiff was admitted to the prison hospital for treatment of a condition described as "anxiety state". Before this, during March and April, he had treatment, both as an outpatient and as an inpatient, for a number of ailments. He received hospital care until June 6, 1947, and

again from June 10 to June 16, 1947. After about one week when he was confined to bed, Dr. Leon A. Witkin, in charge of the hospital, prescribed certain light tasks for the plaintiff as an occupational therapy measure. These tasks included bringing food for the patients from the main kitchen to the hospital, and in washing the steel containers, three in number, in which the food was thus brought.

As an aid in washing the containers, plaintiff was directed to use steel wool. There was a supply of steel wool in the kitchen and the plaintiff was told to help himself as needed. Several other patients in the ambulatory stage performed such work on alternate days. About two weeks after he began this work of cleaning the containers, plaintiff noticed pain in his right thumb. The pain continued and was accompanied by a red discoloration, so that on June 17 he reported to the hospital for treatment. He complained of pain, but did not attribute it to any injury or to any other specific cause. The thumb was given a dressing of yellow oxide ointment to draw any infection to the surface. The thumb was redressed on June 19, 20 and 21. It continued to give pain, so an incision across the fleshy part of the thumb was made on June 23, to permit drainage, and plaintiff was admitted to the inpatient department of the hospital. On June 26, a second incision, of the "alligator mouth" type, was made in the fleshy part of the thumb and near the outer part of the thumb nail. The hospital records in evidence disclose that a single drop of whitish pus was evacuated, and a rubber tissue drain inserted. Just prior to the operation x-rays of the thumb in the lateral and antero-posterior position were taken. The radiographic report does not indicate the presence of any foreign body, and states that there was no evidence of osteomyelitis. Plaintiff was discharged from the inpatient department on July 6, "to duty". He received redressing of the thumb daily in the outpatient department until July 11, 1947, when, according to the hospital records, no further dressing was required.

According to plaintiff's testimony there was still pain in the right thumb at the time of his discharge from the prison on July 14, 1947.

Upon his return to New York City, plaintiff visited his private physician, Dr. Grossman. He was under Dr. Grossman's care for about ten days. It appears that treatment during this time was confined to penicillin shots and dressing the thumb. It remained tender and painful, so upon the recommendation of Dr. Grossman that he visit some hospital in the vicinity of his home, the plaintiff entered Queens General Hospital on July 25, 1947. An x-ray was taken of the thumb at Queens General Hospital. It disclosed no evidence of a foreign body within the fleshy soft tissues which were swollen. However, there was noted "some density" below the tip of the thumb nail. An operation was performed on July 28th, in which a V-shaped portion of the nail was removed and the nail bed under the thumb nail was scraped and separated. In the process, pieces of steel wool, filaments approximately a quarter of an inch long, were found in the nail bed and removed. The hospital records state that "pieces of steel wool" were found, but Dr. Cerniglia, who performed the operation, testified that a single piece of steel filament of the size described above was found. The report of the operation states that at the time of the operation the thumb was not infected.

The plaintiff's main contention is that the source of all the trouble to his thumb was the steel wool subsequently found under the thumb nail, and that the prison doctor was negligent in not discovering its presence. Though the complaint alleges other acts of negligence, the evidence presented by the plaintiff was in large measure directed to this alleged negligence of the doctor.

Before examining the merits there is required a determination of the question raised by defendant whether the present action is rightfully brought un-

der the Federal Tort Claims Act. The government contends that a prisoner in a Federal prison has no right to sue the United States under the Act for personal injuries allegedly sustained through the negligence of government employees.

A similar situation was presented in the case of Sigmon v. United States, D.C.W.D.Va., 110 F.Supp. 906. There, as here, the plaintiff brought an action under the Federal Tort Claims Act for injuries allegedly sustained while confined in a Federal prison. The facts are, it is true, somewhat distinguishable. Although the injury in both cases allegedly occurred while the plaintiff was working in the prison, the plaintiff in the case at bar is primarily concerned with alleged negligence of government employees causing him injury at a time when he was not actually doing assigned work, but rather while in the prison hospital as a patient. On the other hand, for the purpose of construing the application of the Act, it must be noted that the wrong alleged in both cases arose out of or in the course of activity incident to the plaintiff's confinement as a prisoner. Judge Barksdale held that the plaintiff in Sigmon v. United States, supra, could not avail himself of the Federal Tort Claims Act to sue the United States for injuries sustained while confined in a Federal reformatory by reason of negligence of a government employee charged with his supervision.

In Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152, the Supreme Court considered three cases involving the right of members of the armed services to institute an action against the United States under the Federal Tort Claims Act for injuries sustained while on active duty and resulting from the negligence of others in the armed forces. In Feres v. United States, 2 Cir., 177 F.2d 535, Feres' executrix brought an action against the United States to recover for Feres' death, caused by a fire in a barracks while he was on active duty. Negligence was alleged in quartering him in barracks known or which should have been known to be unsafe. In Jefferson v. United States, 4 Cir., 178 F.2d 518, plaintiff, while in the Army, was required to undergo an abdominal operation. About two months later, in the course of another operation after plaintiff was discharged, a towel, marked "Medical Department U. S. Army", was discovered and removed from his stomach. The complaint alleged that it was negligently left there by the Army surgeon. In Griggs v. United States, 10 Cir., 178 F.2d 1, the complaint alleged that while the plaintiff's testator was on active duty he met death because of negligent and unskillful medical treatment by army surgeons. In affirming the Feres and Jefferson cases, which upheld the action of the district court in dismissing the plaintiffs' actions, and in reversing the Griggs case, which took the contrary view, the Supreme Court concluded that the Tort Claims Act did not extend its remedy to one sustaining a wrong "incident to [the] service" [340 U.S. 135, 71 S.Ct. 159] which under other circumstances would be actionable.

In its opinion the Court made it clear that it was not overlooking considerations persuasive of liability. Among such considerations were the following:

1.) The Act confers jurisdiction in the district court generally over claims for money damages against the United States founded on negligence.

2.) That the exceptions contained in the Act might imply inclusion of claims not expressly excepted.

In construing the statute, however, the Court pointed out that the fact that the Act makes "'the law of the place where the act or omission occurred'" govern any consequent liability, 28 U.S.C.A. § 1346(b), was "not without significance" as to whether it should be construed to apply to "service-connected injuries". The Court declared that a soldier on active duty has no choice but must serve any place where his orders send him. It also noted the fact that most states with workmen's compensation statutes have superseded the com-

mon-law action for damages between employer and employee, and the fact that where such statutes are absent or inapplicable, states have differing provisions in respect to limitations of liability as well as different doctrines as to assumption of risk, fellow-servant rules and contributory or comparative negligence. The Supreme Court concluded that

"It would hardly be a rational plan of providing for those disabled in service by others in service to leave them dependent upon geographic considerations over which they have no control and to laws which fluctuate in existence and value." Feres v. United States, supra, 340 U.S. 143, 71 S.Ct. 158.

The plaintiff argues that the provision in the Act equating the liability of the United States to "a private individual under like circumstances", 28 U.S.C.A. § 2674, supports a finding of the right to assert a claim, because, under the pleadings, there would be a cause of action against a private individual for malpractice. The Supreme Court considered this argument in the Feres case, and noting that no private individual has the power to conscript or mobilize a private army, pointed out that the liability assumed by the government under the Act here is created by " 'all the circumstances,' " not that which a few of the circumstances might create.

Without attempting to find an analogy between a member of the Armed Forces on active duty and a prisoner confined in a Federal prison, the analysis of the Supreme Court in the Feres case appears applicable in principle to the instant case. In both instances the relationship between the government and the individuals involved is "distinctively federal in character." No parallel liability in respect to private individuals in "all the circumstances" can be found here, for a private individual is no more empowered to imprison a person privately for a crime than he is to conscript a private army. In dealing with offenders against its laws, the United States is asserting its powers as a sovereign, as distinguished from the power it has to make contracts, hold property and enter into business transactions like other persons, natural or artificial. Moreover, in view of the fact that generally a federal prisoner has no choice as to his place of confinement, it makes no more sense that "the geography of an injury should select the law to be applied to his tort claims" than in the case of members of the Armed Forces on active duty.

The plaintiff, in his memorandum of law, has discussed in some detail the "civil rights" and "constitutional rights" of one confined in prison. By his own admission, however, what he has set forth is a "general and highly scholasticized discussion". Quoting from his brief, "the instant litigation is predicated upon the Government's deliberate waiver of this same exemption (from suit)." The "deliberate waiver" then cited as justifying and supporting this action is the Federal Tort Claims Act. That conclusion must be deemed a non sequitur.

To bar a prisoner from asserting liability against the government under the Tort Claims Act does not result in depriving him of all redress for legitimate claims. For example, Section 4126 of Title 18 U.S.C.A. provides for compensation of inmates employed in a prison industry in accordance with the provisions of the Federal Employees' Compensation Act, 5 U.S.C.A. § 751 et seq. It is significant that the Federal Employees' Compensation Act seeks to make the benefits obtainable thereunder an exclusive remedy.

In view of the foregoing, it must be concluded that Feres v. United States, supra, is controlling here and that there is no right of action against the United States under the Federal Tort Claims Act. See also Shew v. United States, D.C., 116 F.Supp. 1, which follows Sigmon v. United States, supra. Brown v. United States, 209 F.2d 463, decided January 5, 1954, by the United States Court of Appeals for the Second Circuit, I do not read as holding to the contrary.

■ Furthermore, a consideration of the merits, assuming a right of action exists here under the pleadings and the facts, leads to the conclusion that the proof adduced has failed to show that the defendant has been negligent in any way.

The presence of steel wool filaments in plaintiff's thumb does not of itself require a finding of negligence. The use of steel wool in scrubbing kitchen utensils requires no special skill or training. There is no proof that the steel wool furnished by the defendant was defective or inferior in grade. There is equal lack of proof that plaintiff was compelled to work while incapacitated so as to endanger his health. In respect to the allegations as to failure to take x-rays, the proof is to the contrary. The evidence discloses that x-rays of plaintiff's thumb were taken on June 26, 1947, and that there was no evidence of any foreign substance in the thumb.

As to plaintiff's claim of failure or delay in providing medical care, the facts show that all of the innumerable requests made by him for medical attention of ills, actual or otherwise, were given proper attention. In March, 1947, he complained of pain in the shoulder and was given daily diathermy treatments and x-rays were taken. He claimed of "having trouble with stomach—think ulcers," and requested milk and toast with his meals. Consequently he was placed on a special diet. In May, 1947, he requested an operation for circumcision, and an operation was performed accordingly. He asked for eye glasses and was given a pair. He received dental treatment. The treatments for "anxiety neurosis" and the thumb infection have been referred to earlier.

Dr. Witkin examined the plaintiff, performed the operation on his thumb on June 26, and attended to the dressing of the wound. The evidence indicates that Dr. Witkin was a competent doctor with experience in both medicine and surgery, and was properly qualified to perform the duties required of a doctor in charge of the prison hospital. Moreover, there is no evidence indicating that the hospital facilities afforded the plaintiff were inadequate.

The plaintiff called as witnesses Dr. Grossman, already referred to, and Dr. Cerniglia, who operated on plaintiff's thumb in the Queens General Hospital. Both doctors testified that the procedure of treatments given the plaintiff at the prison hospital was good standard medical practice.

As noted, the x-rays taken at the prison hospital showed no evidence of a foreign body in plaintiff's thumb. The hospital records indicate that upon plaintiff's discharge from the hospital on July 7, the thumb was healing normally. Consequently, it would appear reasonable and proper for the doctor to assume that the cause of the infection had been eliminated. The fact that by July 11 dressings were no longer required would appear to bear out this assumption.

The plaintiff testified to continued pain and tenderness of his thumb even after discharge. No infection was found in the thumb on either the examination at the time of admission to Queens General Hospital on July 25, 1947, nor when the operation was performed there on July 28, 1947. The swelling and tenderness of the thumb are attributed to "considerable amount of hyperplasia of underlying tissue" (enlargement from quantitative increase produced by cell-division) in the records of the Queens General Hospital. Undoubtedly the incisions made in the thumb for the purpose of eliminating the infection resulted in this "hyperplasia". So far as the evidence shows, however, the result is regarded as being part of a normal process of healing. As already noted, the thumb was not infected at the time of the operation when the steel wool was removed.

The defendant may have judgment.

Findings of fact and conclusions of law in conformity with the foregoing opinion will be filed herewith.