Henry WINSTON, Plaintiff-Appellant,

v.

UNITED STATES of America,
Defendant-Appellee.

No. 84, Docket 27098.

United States Court of Appeals
Second Circuit.

Argued Nov. 28, 1961.

Decided Feb. 27, 1962.

Rehearing En Banc Decided
June 28, 1962.

John J. Abt, New York City, for plaintiff-appellant.

Jerome I. Levinson, Atty., Dept. of Justice, Washington, D. C. (William H. Orrick, Jr., Asst. Atty. Gen., Morton Hollander, Atty., Dept. of Justice, Washington, D. C., and Robert M. Morgenthau, U. S. Atty., New York City, on the brief), for defendant-appellee.

Before CLARK, HINCKS and KAUFMAN, Circuit Judges.

HINCKS, Circuit Judge.

Appellant Henry Winston, since 1956 a prisoner in the United States Penitentiary at Terre Haute, Indiana, brought this action against the United States under the Tort Claims Act, 28 U.S.C. §§ 1346, 2674 (1958). Winston's complaint

alleged that in April of 1959 he had contracted a brain tumor. Disturbed by his "dizziness, instability, and difficulty with his vision," his then attorney procured an examination by prison medical officers. Negligently failing to use reasonable care and skill in examination, says Winston, the medical officers made a diagnosis of "borderline hypertension" and prescribed a reduction in weight.

The complaint continues. Further attacks, reaching a frequency of "a number of times daily," severe headaches, inability to walk, and periodic loss of vision plagued Winston and caused him to complain to the prison authorities. No further examinations, however, were made; instead he was given dramamine. In January, 1960, Winston's attorney visited him at Terre Haute and, alarmed by his condition, secured examination by a consulting physician. Next month, an operation in New York City removed a benign tumor of the cerebellum. The delay in treatment has made Winston permanently blind.

■ On a motion to dismiss, the court below, which necessarily took the foregoing allegations of the complaint as true, dismissed the complaint on the ground that the Tort Claims Act does not permit suits by federal prisoners against the United States. The question is whether that judgment was right.

Prisoners have traditionally been able to sue their jailers as individuals for injuries caused by the jailer's negligence. See, e. g., Hill v. Gentry, 280 F.2d 88 (8th Cir. 1958), cert. denied, 364 U.S. 875, 81 S.Ct. 119, 5 L.Ed.2d 96 (1960).[1] The doctrine of sovereign immunity, however, has insulated the state from liability for the acts of its agents, see Prosser, Torts, 770–80 (1955).[2]

With the passage of the Tort Claims Act, which by its terms does not except prisoners, it would seem that the sole barrier to federal prisoners' suits against the United States had been removed. Nevertheless, argues the government, the result of allowing such suits would be deleterious to prison discipline and to uniform operation of the prison system. The evil consequences are so plain, it says, that Congress could not possibly have meant to allow them; therefore we should read the statute as containing an implied exception of prisoners' suits.

The argument is circular. The question for decision is what Congress thought and intended. Whether discipline would be impaired is a legislative judgment. To assert that because discipline would suffer Congress could not have intended the result is only to say that Congress thought one thing rather than another—which is the very question we seek to answer.

■ And, circularity apart, the assertions of dire consequences seem to us overdrawn. The results on discipline could hardly be worse when the government is sued than when individual prison employees or officials are defendants. And since the latter class of suits, though possible for some time, seem to have brought neither a multiplicity of suits nor an impairment of prison discipline, the assertion that suits directly against the government would have these results is at best dubious. The government argues that since under the Tort Claims Act the local law is made applicable there will be an undesirable loss of unformity

---

1. To the same effect, see also State of Indiana ex rel. Tyler v. Gobin, 94 F. 48 (Ind.Cir. 1899); Asher v. Cabell, 50 F. 818 (5th Cir. 1892); Magenheimer v. State ex rel. Dalton, 120 Ind.App. 128, 90 N.E.2d 813 (1950); Smith v. Miller, 241 Iowa 625, 40 N.W.2d 597, 14 A.L.R. 2d 345 (1950); O'Dell v. Goodsell, 149 Neb. 261, 30 N.W.2d 906 (1948); Hixon v. Cupp, 5 Okl. 545, 49 P. 927 (1897); Kusah v. McCorkle, 100 Wash. 318, 170 P. 1023, L.R.A.1918C, 1158 (1918).

2. Another bar suspending during period of confinement prisoners' right to sue is the doctrine of civil death. See, e. g., Lipschultz v. State, 192 Misc. 70, 78 N.Y.S.2d 731 (Ct.Cl.1948). But civil death is imposed only by statute, see Note, 63 Yale L.J. 418 (1954), and does not apply to federal prisoners, see Coffin v. Richard, 143 F.2d 443, 155 A.L.R. 143 (6th Cir. 1944).

in the decisions. But this argument adds little of weight. The resulting loss of uniformity is slight compared with that attendant on the Erie doctrine: it is justified by the same considerations. Bankruptcy is also a "uniform system of federal law," but it depends in many cases on state priority and contract law. Moreover, as plaintiff points out, the Tort Claims Act expressly envisions imperfect uniformity in its application by referring the determination of liability to "the law of the place where the act or omission * * * occurred." Considerations of "uniformity" did not disturb the Supreme Court when it held that the United States was liable for the acts of its Forest Service in Rayonier, Inc. v. United States, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed. 2d 354 (1957).

But, says the government, Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), precludes recovery here. Feres denied tort recovery to members of the Armed Forces for injuries incurred in service. The government takes this case not only to establish that implied exceptions may be read into the Act, but to command such an exception here.

The analogy is not close enough to be persuasive. The first premise of Feres was that the Tort Claims Act, while terminating government immunity, created no new liabilities, and that no American law had "ever * * * permitted a soldier to recover for negligence, against *either* his superior officers or the Government he is serving," 340 U.S. at 141, 71 S.Ct. at 157 (emphasis added). Suits by prisoners against jailers and local governments, however, had been authorized prior to the passage of the Tort Claims Act. Further, the pertinence of Feres is at best questionable in view of Rayonier, where it was said (352 U.S. at 319, 77 S.Ct. at 377):

> "It may be that it is 'novel and unprecedented' to hold the United States accountable for the negligence of its firefighters, but the very purpose of the Tort Claims Act was to waive the Government's traditional all-encompassing immunity from tort actions and to establish novel and unprecedented governmental liability."

This language, moreover, arose out of a case stronger for the government than the instant case: municipalities have traditionally not been held liable for acts of their firefighters, but have often been so held for acts of their jailers. Thus analogy to Feres' first premise does not help the government here.

The second premise of Feres was that uniformity in the "distinctively federal" relationship between soldiers and the government was an overriding need. If that is so, it is on considerations of military efficiency. But such considerations are irrelevant to the government-prisoner relationship.

The court's final reason, in Feres, for believing that soldiers were excepted from the Tort Claims Act was that Congress had provided a system of compensation, "simple, certain, and uniform," 340 U.S. at 144, 71 S.Ct. at 158, for injuries or death of members of the Armed Forces. The court spoke of this system, and its generous character, at some length. 340 U.S. at 145–146, 71 S.Ct. 153. And some courts—notably the Eighth Circuit in Lack v. United States, 262 F.2d 167 (1956)—have felt that the existence of a compensation system for prisoners injured in work activity similarly imports an intent to exclude them from the benefits of the Tort Claims Act.

But the prisoners' compensation system, 18 U.S.C. § 4126 (1958), as amended, P.L. 87–317, 75 Stat. 681 (1961), extends only to prisoners actually engaged in work in prison industry and maintenance. Many prisoners are not so engaged at any time, see Note, 63 Yale L.J. 418, 424 & n. 48. And those so employed actually work at such tasks for only a portion of the day. Like many workmen's compensation systems, § 4126 affords redress notwithstanding contributory negligence and even in the absence of negligence on the part of the government. Relief is entirely at the discretion of the Attorney General, and is given in any event only for injuries suffered

on the job, see 63 Yale L.J. at 424. In comparison with the military compensation program, 38 U.S.C. § 700 (1958), [now § 101(13)], which affords relief for virtually all service-incurred injuries, see 340 U.S. at 145, 71 S.Ct. 153, the prison work-compensation plan is vastly less comprehensive and is in no real sense a substitute for tort liability.[3]

If reliance on Feres is thus precluded, little remains to support an exception to the Act which Congress wholly failed to articulate. It is true that the Act equates government liability to that which would attach to a private person. And the government argues that no private person could be liable since none is authorized to hold another in servitude, But, as was said in Rayonier:

> " * * * the test established by the Tort Claims Act for determining the United States' liability is whether a private person would be responsible for similar *negligence* under the laws of the State where the acts occurred. We expressly decided in Indian Towing that the United States' liability is not restricted to the liability of a municipal corporation or other public body and that *an injured party cannot be deprived of his rights under the Act by resort to an alleged distinction,* imported from the law of municipal corporations, *between the Government's negligence when it acts in a 'proprietary, capacity and its negligence when it acts in a 'uniquely governmental' capacity,"* 352 U.S. at 319, 77 S.Ct. at 376. (Emphasis added.)

And see Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). Moreover, a "private person"—i. e., the jailer himself—could be held liable for his negligence here, see Hill v. Gentry, supra. Thus the government cannot claim immunity on either facet of its argument that prisons are a "uniquely governmental" activity.

 The government also claims that two later special Acts of Congress, providing compensation for individuals injured in prison, ratified a construction of the Act denying to prisoners inclusion in the Tort Claims Act. One answer to this. argument is that later cognate legislation is not admissible on the intent of an earlier Congress, Rainwater v. United States, 356 U.S. 590, 593, 78 S.Ct. 946, 2 L.Ed.2d 996 (1958). And in Jones v. Liberty Glass Co., 332 U.S. 524, 68 S.Ct. 229, 92 L.Ed. 142 (1947), when Congress had re-enacted unchanged a bill which since 1939 had been interpreted by lower federal courts in what the Supreme Court felt was a mistaken manner, the court said: "We do not expect Congress to make an affirmative move every time a lower court indulges in an erroneous interpretation." 332 U.S. at 531, 68 S.Ct. at 234. A second, more cogent, answer is that the bills to which the government adverts were private bills, traditionally regarded as the preserve of individual Congressmen, which are passed out of courtesy to the sponsoring Congressman without the deliberation attending the passage of a Public Law. And nothing in the legislative history of these two bills indicates approval of the construction then placed on the Act by the courts.

 We are not unmindful of decisions elsewhere at variance with ours. See Jones v. United States, 249 F.2d 864 (7 Cir. 1957); Lack v. United States, supra; Berman v. United States, 170 F.

3. We see no incompatibility between the statutory provisions for administrative compensation of prisoners for injuries in prison work activities and the Tort Claims Act interpreted as a waiver of government immunity from tort liability to its prisoners. In computing damages in any recovery under the Tort Claims Act, the trial judge would of course deduct any administrative compensation theretofore paid as compensation arising from a work injury. And any prior judgment under the Tort Claims Act would doubtless be credited by the Attorney General against any administrative allowance for work compensation which would, but for the judgment in the tort action, have been awarded to the prisoner.

Supp. 107 (E.D.N.Y.1959); Van Zuch v. United States, 118 F.Supp. 468 (E.D.N.Y.1954); Shew v. United States, 116 F.Supp. 1 (M.D.N.C.1953); and Sigmon v. United States, 110 F.Supp. 906 (W.D.Va.1953). However, our evaluation of the factors pertinent to the problem has convinced us that our decision is required not only by the intrinsic worth of the arguments which have been advanced but also by the rationale of Rayonier, Inc. v. United States, supra.

Reversed.

KAUFMAN, Circuit Judge (dissenting).

Although the majority is "not unmindful of decisions elsewhere at variance" with its own, apparently it ascribes little significance to the fact that without exception every court which has considered this issue has held that the government is not liable for the negligence of its prison officials under the Federal Tort Claims Act. See James v. U. S., 280 F.2d 428 (8th Cir.), cert. denied, 364 U.S. 845, 81 S.Ct. 88, 5 L.Ed.2d 69 (1960) following Lack v. U. S., 262 F.2d 167 (8th Cir. 1958); Jones v. U. S., 249 F.2d 864 (7th Cir. 1957); Muniz v. U. S., 60 Civ. 1624, S.D.N.Y., Nov. 4, 1960, rev'd 305 F.2d 285 (2nd Cir. 1962) (this day); Berman v. U. S., 170 F.Supp. 107 (E.D.N.Y.1959); Golub v. U. S., Civ. No. 148–117, S.D.N.Y. Oct. 5, 1959; Collins v. U. S., No. T–1509, D.Kan., Jan. 29, 1958; Trostle v. U. S., No. 1493, W.D.Mo., Feb. 20, 1958; Van Zuch v. U. S., 118 F.Supp. 468 (E.D.N.Y.1954); Shew v. U. S., 116 F.Supp. 1 (M.D.N.C.1953); Sigmon v. U. S., 110 F.Supp. 906 (W.D.Va.1953); Ellison v. U. S., No. 1003, W.D.N.C., July 26, 1951.[1] However, what disturbs me is that not only does the majority opinion "interpret" the words of the Act in a manner which has been rejected by Circuit and District Courts repeatedly, but that it does this without the support of a shred of relevant legislative history.

As a result, the Court has filled the vacuum created by Congressional silence with its own notions of public policy, but not a policy legitimately attributable to Congress. Not since Shadrach, Meshach, and Abednego has goodness triumphed with such ease. But I fear that the price of this triumph is too great, for with a sweep of the hand we disregard the traditional tools of adjudication.

Statutory construction of the nature indulged in by the Court in this case is hazardous business. The principal danger, realized in this case, is that courts will tread where Congress has not. Speaking of this very problem Justice Frankfurter perceptively notes:[2]

"In the realms where judges directly formulate law because the chosen lawmakers have not acted, judges have the duty of adaptation and adjustment of old principles to new conditions. But where policy is expressed by the primary lawmaking agency in a democracy, that is by the legislature, judges must respect such expressions by adding to or subtracting from the explicit terms which the lawmakers used no more than is called for by the shorthand nature of language."

Justice Frankfurter recognizes that "there are not wanting those who deem naive the notion that judges are expected to refrain from legislating in construing statutes," cf. Clark, Federal Procedural Reform and States' Rights; to a More Perfect Union, 40 Tex.L.Rev. 211, 223–229 (1961), and he is not unaware that "judges may differ as to the point at which the line [between adjudication and legislation] should be drawn."[3] Nevertheless, this renowned jurist of undoubted experience in these matters warns that "the only sure safeguard against crossing the line * * * is an alert recognition of the necessity not to cross it and instinctive, as well as trained, reluctance to do so."[4]

1. But see Lawrence v. U. S., 193 F.Supp. 243 (N.D.Ala.1961).

2. Westin, The Supreme Court: Views from Inside, p. 83 (1961).

3. Id., p. 82.

4. Id.

In the instant case the facts alleged in the complaint evoke great sympathy. But in the Court's eagerness to afford relief I believe it has too easily overcome its usual considered reluctance to abandon notions of judicial restraint. I understand its position; I appreciate its generosity; and I agree that there are occasions in which, as Justice Holmes recognized, "judges do and must legislate * * * interstitially." [5] But this decision does not reflect the "molar to molecular" motion which Holmes envisioned; and I cannot join the Court in making its "judicial leap."

> "The judge, even when he is free, is still not wholly free. He is not to innovate at pleasure. He is not a knight-errant roaming at will in pursuit of his own ideal of beauty or of goodness * * * He is not to yield to spasmodic sentiment, to vague and unregulated benevolence * * * " Cardozo, The Nature of the Judicial Process, p. 144 (1921).

It is proverbial that hard cases make bad law. Perhaps it is but another way of stating the same idea to suggest that hard cases also induce courts to "make" law where it is plain under the circumstances that such is not their constitutional function.

It is particularly unfortunate that in the present case the unwarranted judicial legislation has been accomplished, as if by sleight of hand, through the majority's willingness to assume the very question presented for decision. Its opinion, which treats the question of government liability as if it were being considered for the first time by a federal court, assumes that the absence of any explicit provision excluding prisoner claims from the coverage of the Federal Tort Claims Act necessarily indicates a Congressional intent to include them. But, insofar as the scope of the waiver of immunity contemplated by the Act is concerned, the doctrine of *expressio unius* has been expressly rejected by the Supreme Court. Feres v. U. S., 340 U.S. 135, 138–139, 71 S.Ct. 153, 95 L.Ed. 152 (1950). Canons of construction cannot save us from "the anguish of judgment." [6] It is not enough that the statute "by its terms does not except prisoners"; our inquiry must be directed to the question whether Congress "intended" to include them. Or, stated more accurately under the circumstances of this case, in John Chipman Gray's often quoted words, it is up to this Court "to guess what it would have intended on a point not present to its mind, if the point had been present." [7]

Would Congress have intended that a statute which waived sovereign immunity and subjected the government to varied liability to the general public for negligent operation of post office trucks, army airplanes, etc. also superimposed upon the closely regulated government-prisoner relationship [8] a liability to prisoners for negligent operation of our penal system? A majority of this panel of the Court says that "it would seem" that it does; I respectfully disagree. Instead I am constrained to agree with the Court of Appeals for the Seventh Circuit that "it seems unlikely that it ever occurred to any of the members of Congress that the claim would be made that the remedies under that Act would be available to an inmate of a federal correctional institution." Jones v. U. S., supra, 249 F.2d at pp. 865–866. This is not to say that Congress, if confronted with the partic-

5. Southern Pacific Co. v. Jensen, 244 U.S. 205, 221, 37 S.Ct. 524, 531, 61 L.Ed. 1086 (1917).

6. Westin, op. cit. supra, at p. 91 (Frankfurter, J.).

7. Gray, Nature and Sources of the Law: Statutes (2 ed. 1921). See also Learned Hand's concurring opinion in Guiseppi v. Walling, 144 F.2d 608, 624, 155 A.L.R. 761 (1944):

> "As nearly as we can, we must put ourselves in the place of those who uttered the words, and try to divine how they would have dealt with the unforeseen situation; and, although their words are by far the most decisive evidence of what they would have done, they are by no means final * * * "

8. See Lack v. U. S., supra, 262 F.2d at p. 169.

ular issue of government liability for injuries sustained by prisoners through negligence of its agents might not devise a scheme of compensation.[9] However, I maintain that it is not for the Court to speculate whether such a remedy will be provided in the wisdom of that august body. Rather, it is whether Congress meant that the Federal Tort Claims Act should accomplish that purpose.

A number of arguments have been advanced by the government, and accepted by other courts in considered opinions, which suggest that this statute of general and undefined application was not "intended" to apply in the prisoner situation. The first, and most significant, relates to problems inherent in judicial review of action taken by prison authorities to enforce prison discipline. The case of Muniz v. U. S., supra, decided this day, is an excellent illustration of this point. Muniz claimed that he was beaten by other inmates during a prison riot and that he sustained permanent injuries of a grave nature. He contended that the prison authorities were negli-

gent both in the general manner in which they ran the prison, and in the steps taken to control the riot. The guards, it was alleged, had locked the rioting prisoners in their dormitory; and this prevented Muniz from seeking assistance from the authorities or escaping from his tormentors.[10] In holding that Muniz may sue under the Act, the trial judge will have to examine almost every facet of prison administration. In addition, I should suppose that he will be required to substitute his conception of "reasonable behavior" for that of the persons charged by statute with the responsibility of running the prisons. In Feres v. U. S., supra, the Supreme Court thought that analogous problems relating to review of military decisions and soldier discipline suggested that the Federal Tort Claims Act could not reasonably be construed to permit soldiers' claims against the government. See U. S. v. Brown, 348 U.S. 110, 112, 75 S.Ct. 141, 99 L.Ed. 139 (1954); Jefferson v. U. S., 178 F.2d 518, 520 (4th Cir. 1959), aff'd sub nom., Feres v. U. S., supra; see also Healy v.

---

**9.** As the majority opinion points out, Congress has seen fit to provide a limited compensation scheme for prisoners injured in any work activity. The Court of Appeals for the 8th Circuit suggests with much persuasiveness that "if Congress had intended to create a cause of action for negligence in favor of the * * * federal prisoner, it would * * * likely * * * have placed a limitation on the amount of recovery * * *." Lack v. U. S., supra, at p. 171.

**10.** Although it is difficult to conceive of a more vivid example of the extent of "outside" interference with prison operations which will result from the imposition of judicial scrutiny, other situations come to mind quite readily.

For instance, it regularly occurs that prisoners inflict severe injuries on "unpopular inmates." This may result from the operation of kangaroo courts, or from personal grudges, racial hatreds, or problems related to sex deviation. Frequently these assaults occur when the prisoners are permitted to congregate in large groups during leisure hours. When this happens, under the decision of the Court in this case, will the trial judge have to decide whether it was unreasonable to al-

low the prisoners to congregate without very extensive supervision? If this does constitute negligence, will there arise some *per se* liability for the consequences, even if it is shown that for lack of Congressional appropriation the prisons are not adequately staffed for such purposes? Or, are we inviting prison authorities to restrict such leisure periods lest assaults be attributed to an inadequate number of guards? How many guards would be adequate? One for each prisoner or one for ten prisoners? These questions are unanswerable without more information which Congress could obtain after a full hearing on proposed legislation. Is there not a danger that we may tempt the prison authorities, in an excess of caution, to revert to outmoded methods of strict disciplinary administration?

Moreover, we are dealing with all sorts of inmates who have been isolated for society's own protection. Many of them resent society, the judge who sent them to prison, their families, etc. There is more or less continuing opportunity for violence in prisons, and psychiatrists look upon this as a type of "safety valve" for the release of these resentments.

U. S., 192 F.Supp. 325, 326–329 (S.D. N.Y.), aff'd, 295 F.2d 958 (2nd Cir. 1961). Whether the dire·consequences which the government claims will result from imposition of liability are overdrawn or not, they are certainly not wholly fanciful; and they suggest that there is reasonable cause for investigation of facts, and evaluation of professional expertise on the subject before liability is assumed by the government. Congress has ample facilities for such investigation; we do not. And we do not know what Pandora's box we are opening by permitting government liability under these circumstances for the first time.

The majority argues that it is up to Congress to decide if imposition of tort liability will adversely affect prison discipline. I agree. But I would think that Congress, faced with these problems would take pains to discover whether the adverse circumstances prophesied by the government will result; and that only after weighing all of the information available to it would it decide whether it is more desirable to permit prisoner suits against the government or whether this is an area where in the public interest it is better to continue to retain the cloak of sovereign immunity.

The government has urged upon us other considerations which would suggest that Congress did not "intend" that the Act should extend to the prisoner situation. It directs our attention to the source of the liability contemplated by the Federal Tort Claims Act itself. Under that Act the law of the place where the injury is sustained determines the existence and measure of the government's liability. Therefore, under its provisions, the right of a prisoner to recover damages for his injury will depend upon the law of the place of his confinement. The Court dismisses an objection based on this result as being insubstantial, since the lack of uniformity in the treatment of the public and in the nature of the federal obligation was clearly intended by the framers of the Act. But this legislative design is of no significance unless we assume that such lack of uniformity is of approximately equal desirability in all instances in which the government may be held liable for the acts of its agents, an assumption which is demonstrably false.

It is some justification for dissimilar treatment of injured persons that they should be permitted to recover damages from the government only to the same extent as they might recover from any other tortfeasor in the state where the tort victim chose to be present. This is a large country; for purposes of tort law it is divided, in effect, into fifty jurisdictions. If a person chooses to live, work, or travel in Montana, he cannot claim that he is being unjustly treated because under Montana law, he cannot recover for injuries sustained there—although he might have been able to recover under the laws of New York or California, if he had been injured in those places. He cannot be heard to complain unless he is willing to challenge the nature of our entire federal system. Congress thought it reasonable to subject the federal government to liability within that multi-jurisdictional framework rather than to create a federal tort law which might afford remedial relief to either a greater or lesser degree than would otherwise be available to the injured person. The "justice" of this approach, from the view of the injured person, was thought to outweigh the need for uniform rules of federal liability.

It is quite another thing, however, to say that Congress "intended" to make an injured prisoner's right to recover damages depend on the wholly fortuitous circumstance of the location of his prison, chosen not by him but by the Bureau of Prisons. For example, a New York dope addict will be confined most likely in Lexington, Kentucky; or a dangerous criminal, convicted in Maine, may be imprisoned off the coast of California. There are 31 federal institutions in 24 states. Assignment of a prisoner to any one of them depends upon a multitude of factors, of which geographical proximity to his home is but one. It seems to me

that it would be unfair to make a lottery out of the prisoner's right to recovery. Why should his recovery be dependent upon the chance that the Director of the Bureau of Prisons will choose the "right" state with the "right" law for the inmate's incarceration? Is the Director now to make his assignments by a roulette wheel, with the "lucky" prisoner being assigned to the "right" prison in the "right" state?

It quite escapes me how the force of this argument is weakened by the fact that the Act has been held to permit prosecution of a claim under Mississippi law for negligent operation of a local lighthouse which caused a ship to run aground in that state's waters, Indian Towing Co., Inc. v. U. S., 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955); or that negligent acts of the Forest Service in Washington create liability under Washington law for injury to property in that state. Rayonier, Inc. v. U. S., 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957). In those instances the only question is whether local injuries ought to be compensated under local law or whether the principle of uniformity of federal obligations requires otherwise. As I have said, more closely akin to the facts in this case are those found in Feres v. U. S., supra. There, the Supreme Court believed it made "no sense" to predicate liability for soldiers' injuries "upon geographic considerations over which they have no control and to laws which fluctuate in existence and value," 340 U.S. p. 143, 71 S.Ct. p. 158. Once more the analogy is approximate because of different facts. But it is plainly relevant, and other courts [11] have considered it controlling, "for like reason doth make like law." Coke, First Institute, 10. Not only is Feres similar by virtue of the fact that neither the soldier nor the prisoner has any choice concerning the place in which he must reside, but because in each of these instances the relationship of the parties is of a peculiarly federal nature. Lack v. U. S., supra, 262 F.2d at p. 169.

Finally, the government argues quite forcefully that even Congress has indicated that it did not "intend" to allow prisoner claims against the government under the Federal Tort Claims Act.[12] Proceeding on the reasonable assumption that the significance of an enactment may be understood by examining its antecedents, its later history, and its relation to other enactments,[13] we observe that years before the passage of the Tort Claims Act Congress had provided a limited compensation scheme for injuries sustained by prisoners while engaged in activities sponsored by the Federal Prison Industries Board. See 18 U.S.C. § 4126. And years after that Act was adopted, in 1961 to be precise, when the Attorney General proposed new legislation intended to provide "equal treatment to all prisoners who may be injured in the course of employment while con-

11. See Jones v. U. S., supra, 249 F.2d at p. 866: "It is hardly conceivable that Congress intended in the passage of the Tort Claims Act to give prisoners rights of action 'in accordance with the law of the place where the act or omission occurred,'" quoting Sigmon v. U. S., supra, 110 F.Supp. at p. 908; Lack v. U. S., supra, 262 F.2d at p. 169.

12. It also urges that it does not follow that because suits against individual prison employees have been maintained on occasions, suits against the government should therefore be permitted. I agree, for to apply this reasoning is to do little more than put an unwarranted gloss on the area of the law under discussion.

Essentially, we are dealing with the sovereign's traditional right to immunity from suit in the absence of express waiver. Surely the majority does not seriously urge that because suits against employees have been possible, and there has not been either a multiplicity of suits or impairment of prison discipline, it follows that a like situation will result if the government can be sued directly. Does not the ability of the defendant to make good a judgment against it play an important part in the consideration of whether to bring a suit? The question, as Chief Justice White used to say, answers itself.

13. See Westin, op. cit., supra, pp. 83–86.

fined," [14] the House Committee on the Judiciary noted that:

"Presently there is no way under the general law to compensate prisoners injured while so engaged. Their only recourse has been to appeal to Congress, and this Committee has reported numbers of private relief bills for such prisoners." [15]

That proposed legislation became Public Law 87–317, 75 Stat. 681 on September 26, 1961. It seems to me that it is especially significant that although Congress was aware of the fact that prisoners could not recover damages for injuries "under the general law," and saw fit to provide an extension of compensation-type relief to certain additional prisoners, it did not undertake to provide them with a comprehensive remedy under the "general law," or to provide any remedy at all for other prisoners, such as Henry Winston, who are injured as a result of non-work activities. Is this not abundant indication that Congress is undertaking a gradual and selective program in dealing with the peculiar problem of compensation for injuries suffered by prisoners? Does this legislation not suggest that Congress prefers the use of administrative rather than judicial machinery for this purpose? Is it reasonable to suppose that Congress would be cautiously extending this compensation-type remedy, limited in scope, and dependent wholly upon the discretion of the Attorney General,[16] if it had already made available to all prisoners comprehensive relief under the Tort Claims Act? I am driven to a negative answer. In the clear absence of evidence of Congressional "intention" concerning the coverage of the Tort Claims Act, it is apparent that this

recent enactment by Congress casts doubt upon the Court's interpretation of the Act. The majority opinion dismisses this argument by attempting to use another canon of construction, to wit, action taken by Congress several months ago "is not admissible on the intent of an earlier Congress." But, Justice Frankfurter gives us the answer to this: "to illumine these dark places in legislative composition all the sources of light must be drawn upon." [17]

The majority dismisses as of little significance the fact that Congress has repeatedly considered and passed private legislation to compensate prisoners for injuries which result from negligent acts of prison officials. These private bills reflect complete awareness by Congress of the unanimous judicial opinion until today, that the Federal Tort Claims Act afforded no alternative relief.[18] It may be true that private bills such as these are regarded as the "traditional preserve of individual Congressmen." But this must be viewed in the light of our knowledge that "Congress has adopted a policy of not passing private bills where relief is available under the Tort Claims Act." Lack v. U. S. supra, 262 F.2d at p. 171.

I submit that before the Court takes such a bold step in this delicate area, concerning as it does the entire field of treatment of transgressors by the government and the methods to be employed in protecting society, the Court ought to be reasonably certain that its decision in fact reflects the policy of Congress. In the light of the past history of litigation in this area and subsequent Congressional action, I do not think the decision of the Court is founded upon Congressional policy or judicial precedent. The time may have come when it is

14. H.Rep. No. 534, 87th Cong., 1st Sess. 3.

15. H.Rep. No. 534, supra, at p. 2.

16. See 63 Yale L.J. 423 (1954).

17. Baltimore & Ohio R. R. v. Kepner, 314 U.S. 44, 60, 62 S.Ct. 6, 13, 86 L.Ed. 28 (1941).

18. See e. g., Act of July 14, 1956, Private Law 773, Chapter 615, 70 Stat. A124, and the accompanying report of the Senate Committee on the Judiciary, S. Rep. No. 1976, 84th Cong., 2d Sess. 2, quoted in Lack v. U. S., supra, 262 F.2d at p. 171.

deemed politically, socially, and economically wise to permit prisoners to entertain suits against the government. And such considerations may outweigh the possibility of damage to discipline in our penal system or other problems of administration. But that is for Congress to decide. This it has not done. We must be careful to avoid giving the impression that when judges think Congress has been too slow in legislating, they will assume the duties of "knights-errant," and will find the means (under the guise of "interpretation") to show their impatience. In an instance where legislative "intent" and judicial precedent is so clearly the other way, this is dangerous dogma. I would follow the course taken by the Supreme Court in Feres v. U. S., supra, which in denying relief to servicemen under the statute for reasons similar to those espoused in this dissenting opinion said:

"There are few guiding materials for our task of statutory construction. No committee reports or floor debates disclose what effect the statute was designed to have on the problem before us, or that it even was in mind. Under these circumstances, no conclusion can be above challenge, but if we misinterpret the Act, at least Congress possesses a ready remedy." 340 U.S. 135, 138, 71 S.Ct. 153, 155.

How much more forceful is this admonition when we observe the long line of cases interpreting the Act as affording no relief to prisoners asserting claims such as this one,[19] and that there has been no action by Congress over the years to "remedy" any "misinterpretation."

19. See Klein v. U. S., 268 F.2d 63, 64 (2nd Cir. 1959), in which a panel of this Court, in another situation, thought that these cases provided "persuasive analogy" for denial of relief under the Act.

1. Lack v. United States, 262 F.2d 167 (8th Cir. 1958); Jones v. United States, 249 F.2d 864 (7th Cir. 1957).

2. Berman v. United States, 170 F.Supp. 107 (E.D.N.Y.1959); Van Zuch v. United States, 118 F.Supp. 468 (E.D.N.Y.1954);

## Rehearing *En Banc*

Before LUMBARD, Chief Judge, and CLARK, WATERMAN, MOORE, FRIENDLY, SMITH, KAUFMAN, HAYS and MARSHALL, Circuit Judges.

HAYS, Circuit Judge, with whom Judges CLARK, WATERMAN, SMITH and MARSHALL concur.

The question presented by this case is whether a prisoner in a federal penitentiary may sue the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2674–2680 (1958), for injuries incurred as the result of the negligence of prison officials. The case was originally heard by a panel consisting of Judges CLARK, HINCKS and KAUFMAN and the question was resolved, Judge KAUFMAN dissenting, in favor of the right of the prisoner to sue. The issue being important, and the decision of the panel in conflict with the decisions of two other Courts of Appeals [1] and several federal district courts,[2] rehearing *en banc* was ordered by a majority of the circuit judges of the Circuit who are in active service.[3] (See 28 U.S.C. § 46(c) (1958).) We have reached the same conclusion as did the majority of the panel. The order of the district court dismissing the complaint is reversed.

We adopt as our own the opinion of Judge HINCKS, appearing at 305 F.2d 254 (1962), and refer to it for a statement of the facts. We think it desirable, by way of response to certain arguments raised in the course of our reconsideration of this matter, to analyze briefly several of the considerations which we believe lend additional support to the conclusion which we have reached.

Shew v. United States, 116 F.Supp. 1 (M.D.N.C.1953) (alternative holding); Sigmon v. United States, 110 F.Supp. 906 (W.D.Va.1953). But see: Lawrence v. United States, 193 F.Supp. 243 (N.D. Ala.1961).

3. Rehearing *en banc* was also ordered in Muniz v. United States, decided February 27, 1962 and reported 305 F.2d 285, in which the same issue is involved.

## I.

The Federal Tort Claims Act authorizes federal district courts to entertain civil actions against the government when compensation is sought (1) for injury to person or property, (2) caused by the negligence of a government employee acting within the scope of his office or employment, (3) in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b) (1958).

Winston seeks compensation for personal injuries allegedly attributable to negligent medical diagnosis and treatment by the responsible personnel of a federal penitentiary in Terre Haute, Indiana. The first two requirements of the statute are thus satisfied. As to the third requirement—that private persons be liable under like circumstances—Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), provides the necessary guidance. There the Supreme Court held the government liable for negligent operation of a lighthouse. The Court rejected the government's argument that it was immune from liability because private persons do not operate lighthouses.

> "The Government reads the statute as if it imposed liability to the same extent as would be imposed on a private individual 'under the same circumstances.' But the statutory language is 'under like circumstances' and it is hornbook tort law that one who undertakes to warn the public of danger and thereby induces reliance must perform his 'good Samaritan' task in a careful manner." 350 U.S. 64–65, 76 S.Ct. 124.

See Rayonier, Inc. v. United States, 352 U.S. 315, 319, 77 S.Ct. 374, 1 L.Ed. 2d 354 (1957).

The law of Indiana, "the place where the act or omission occurred," provides for two situations in which the "circumstances" are "like" those of the case at bar; the liability of a physician or a hospital for negligent care of a patient, see Worster v. Caylor, 231 Ind. 625, 110 N.E.2d 337 (1953); Fowler v. Norways Sanitorium, 112 Ind.App. 347, 42 N.E.2d 415 (1942), and the liability of prison officials in their individual capacities for negligent treatment of prisoners, see Magenheimer v. State, 120 Ind.App. 128, 90 N.E.2d 813 (1950); Indiana ex rel. Tyler v. Gobin, 94 F. 48 (C.C.Ind. 1899).

The present case thus comes squarely within the plain meaning of the Act.

The Act lists thirteen kinds of claims as to which immunity is not waived. None of these exceptions remotely relates to claims by persons who have suffered injury while being held in a federal prison (28 U.S.C. § 2680 (1958)). The House Report on the bill which later became the Federal Tort Claims Act stated that:

> "The present bill would establish a uniform system authorizing the administrative settlement of small tort claims and permitting suit to be brought on *any tort claim* * * * *with the exception of certain classes of torts expressly exempted from operation of the act."* (Emphasis supplied.) H.R.No.1287, 79th Congress, 1st Sess. 3 (1945).

The care with which Congress detailed the express exclusion from the coverage of the Act of those situations in which the right of recovery was considered undesirable (H.Rep.No.1287, supra at 5–6 (1945)), leaves no room for the exception of additional situations which would otherwise be covered by the statute.

> "There is no justification for this Court to read exemptions into the Act beyond those provided by Congress. If the Act is to be altered that is a function for the same body that adopted it." Rayonier, Inc. v. United States, 352 U.S. 315, 320, 77 S.Ct. 374, 377, 1 L.Ed.2d 354 (1957).

## II.

If, in spite of the unambiguous character of the statute, resort is had to the

legislative history, that history, insofar as it is relevant at all to the question now before us, tends to support a broad application of the Act and, more specifically, the coverage of federal prisoners.

■ The purpose of the Federal Tort Claims Act was to give to the district courts jurisdiction over tort claims against the Government for which the only existing remedy was private relief legislation. The act was passed concurrently with legislation prohibiting private bills and relegating claimants to the newly created judicial remedy. 60 Stat. 831 (1946); 2 U.S.C.A. § 190g. The system of private bills led to inequalities in the administration of justice and imposed a heavy burden on Congress.[4] H.Rep.No.1287, supra at 2 et seq.; Sen.Rep.No.1400, 79th Congress, 2d Sess. 30–34. Claims arising out of prison injuries contributed to the burden from which Congress sought relief.

■ Directly relevant to the present case is congressional consideration of the prevailing New York practice. In 1929 New York State enacted a statute waiving sovereign immunity from tort liability. Laws of New York, 1929, ch. 467.* The House Report on the Federal Tort Claims Act, supra at 3 took express note of the New York statute and of the state's experience with it and concluded that "[s]uch legislation does not appear to have had any detrimental or undesirable effect." The Report notes that the New York "legislation went much further than the pending bill, because no exceptions to liability and no maximum limitation on amount of recovery was prescribed," leaving the inference that in all other respects the New York legislation was the same as the bill they were considering. It was then settled New York law that, under the waiver of immunity statute, a prisoner could recover for injuries resulting from negligent treatment at the hands of the prison authorities. Paige v. New York, 269 N.Y. 352, 199 N.E. 617 (1936); Sullivan v. State, 257 App.Div. 893, 12 N.Y.S. 2d 504, aff'd, 281 N.Y. 718, 23 N.E.2d 543 (1939); White v. State, 260 App.Div. 413, 23 N.Y.S.2d 526 (1940), aff'd, 285 N.Y. 728, 34 N.E.2d 896 (1941); Kurtz v. State, 183 Misc. 991, 52 N.Y.S.2d 7 (Ct.Cls.1944). Since the House Committee examined the practice under the New York law, and made no exception for claims by prisoners, it may safely be assumed that the intent was to encompass such claims.[5]

---

4. The facts in the cases could not be fully developed at Washington, far from the scene. The committees did not have the time to hold full dress trials nor the proper makeup to handle them adequately. The claimant was put to considerable expense and the difficulty that Congress had in determining validity frequently led to drastic limitation of recovery, even where the private legislation provided for permission to sue rather than authorization for payment. There were long delays. Consideration of claims was enormously burdensome, not only for members of the claims committees of the Congress but also for all the members whose constituents were claimants.

See United States v. Yellow Cab Co., 340 U.S. 543, 549–550, 71 S.Ct. 399, 404, 95 L.Ed. 523 (1951):

"* * * The bill became Title IV of the Legislative Reorganization Bill of 1946 at a moment when the overwhelming purpose of Congress was to make changes of procedure which would enable it to devote more time to major public issues. The reports at that session omitted previous discussions which tended to restrict the scope of the Tort Claims bill. The proceedings emphasized the benefits to be derived from relieving Congress of the pressure of private claims. Recognizing such a clearly defined breadth of purpose for the bill as a whole, and the general trend toward increasing the scope of the waiver by the United States of its sovereign immunity from suit, it is inconsistent to whittle it down by refinements."

* Now Court of Claims Act, § 8.

5. The minority misreads the legislative history by suggesting that House Report 1287 treats alike the statutes of New York, California, Illinois and Arizona. Not only does the report emphasize the similarity between the New York statute and the pending bill with respect to general waiver of immunity and the basis of liability (as well as the differences with respect to maximum recovery and exclu-

### III.

Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), which held that a member of the armed services could not bring an action under the Federal Tort Claims Act for injuries resulting from negligence of other military personnel, does not require that we reach any different conclusion from that to which a reading of the statute leads us. The decision in that case was rested chiefly on four considerations which we now proceed to examine in the light of the present case.

1. The Court pointed out that plaintiffs could not satisfy the requirement of the statute that claims will be entertained "under circumstances where the United States, if a private person, would be liable to the claimants in accordance with the law of the place where the act or omission occurred."

"It will be seen that this [the act] is not the creation of new causes of action but acceptance of liability under circumstances that would bring private liability into existence. * * * One obvious shortcoming in these claims is that plaintiffs can point to no liability of a 'private individual' even remotely analogous to that which they are asserting against the United States. We know of no American law which ever has permitted a soldier to recover for negligence, against either his superior officers or the Government he is serving. * * * We find no parallel liability before, and we think no new one has been created by, this Act. Its effect is to waive immunity from recognized causes of action and was not to visit the Government with novel and unprecedented liabilities."

340 U.S. at 141–142, 71 S.Ct. 157. But see Rayonier, Inc. v. United States, 352 U.S. 315, 319, 77 S.Ct. 374, 377, 1 L.Ed. 2d 354 (1957).[6]

sions) but it also correctly characterizes the California and Arizona statutes as merely permitting suits to be brought against the state. Thus the Report in the very terms which it uses recognizes a difference between the New York statute, which is a general waiver of immunity from liability, and the California-Arizona statute, which merely permits suits to be brought on claims against the state which arise out of the state's "proprietary" activities, instances in which liability without a judicial remedy antedated the statute. If, as we may assume from the Report's reference to the absence of detrimental or undesirable effects from the legislation, the Report is based upon some examination of the experience under the statutes, the difference between the two types of statute is made doubly certain by an examination, not of the Arizona and California cases cited by the dissent, because with one exception those cases were decided after the date of the Report, but of earlier cases to the same effect, i. e., that the California-Arizona statute does not, like the New York statute and the Federal Tort Claims Act, waive sovereign immunity against liability, but only, as the Report states, immunity against suit on legally recognized claims against the state, i. e., claims against it in its "proprietary" capacity. Since it is obvious that the operation of a prison system is a "public" and not a "proprietary" activity, presumably prisoners cannot recover under the California-Arizona type of statute although no case is cited in which either state has so held. By rejecting this type in favor of the New York type of statute the federal legislation provided for the possibility of suits by prisoners. And under the same assumption that the committee examined New York practice, it is certainly reasonable to conclude that they were aware of the broad interpretation this closely analogous statute had received and particularly of the refusal of the New York courts to create an exemption for prisoners.

6. "It may be that it is 'novel and unprecedented' to hold the United States accountable for the negligence of its firefighters, but the very purpose of the Tort Claims Act was to waive the Government's traditional all-encompassing immunity from tort actions and to establish novel and unprecedented governmental liability." 352 U.S. at 319, 77 S.Ct. at 377.

In Healy v. United States, 192 F.Supp. 325, 329, n. 16 (S.D.N.Y.), aff'd on opinion below, 295 F.2d 958 (2d Cir. 1961), Judge Weinfeld concluded, on the basis of Rayonier and Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), that the ground in Feres exemplified by the quotation in the

This argument is not applicable to the case at bar because there is a close analogy in the private liability of prison officials which is well known in American law, see Hill v. Gentry, 280 F.2d 88 (8th Cir.), cert. denied, 364 U.S. 875, 81 S.Ct. 119, 5 L.Ed.2d 96 (1960); Indiana ex rel. Tyler v. Gobin, supra; Asher v. Cabell, 50 F. 818 (5th Cir. 1892); Magenheimer v. State, supra; Smith v. Miller, 241 Iowa 625, 40 N.W.2d 597, 14 A.L.R.2d 345 (1950); O'Dell v. Goodsell, 149 Neb. 261, 30 N.W.2d 906 (1948); Hixon v. Cupp, 5 Okl. 545, 49 P. 927 (1897); Kusah v. McCorkle, 100 Wash. 318, 170 P. 1023, L.R.A.1918C, 1158 (1918).[7]

2. The Court noted that the purpose of the Act was to transfer responsibility for the processing of tort claims from Congress to the Judiciary.

"This Act, however, should be construed to fit, so far as will comport with its words, into the entire statutory system of remedies against the Government to make a workable, consistent and equitable whole. * * The primary purpose of the Act was to extend a remedy to those who had been without * * * Congress was suffering from no plague of private bills on the behalf of military and naval personnel, because a comprehensive system of relief had

been authorized for them and their dependents by statute."

340 U.S. at 139–140, 71 S.Ct. at 156.

Of course, this consideration has no application whatsoever to the case at bar. Federal prisoners have, with a limited exception, no alternative means of redress and private bills on their account unquestionably demanded the attention of Congress. If federal prisoners are held outside the intended scope of the Act, Congress will continue to be faced with private bills for their relief, the very evil the waiver was designed to avoid. Thus, a rule of construction favoring the attainment of an "equitable whole" is persuasive of liability in this case.

3. The Court noted that the relationship between the Government and members of the armed services is "exclusively federal," i. e., did not in any sense depend on the operation of state law, and that Congress had manifested its intent that it remain so in the area of compensation for personal injuries by enacting "systems of simple, certain, and uniform compensation for injuries or death of those in the armed services.[8] The compensation system, which normally requires no litigation, is not negligible or niggardly, as these cases demonstrate. The recoveries compare extremely favorably with those provided

text had been abandoned by the Supreme Court.

**7.** The dissenting opinion misconceives the intention of our reference to the individual liability of prison officials which we say establishes that, unlike the situation in Feres, liability to prisoners is not "novel and unprecedented."

It is obvious from Rayonier and Indian Towing Company that liability is to be assessed in accordance with the applicable general substantive tort law. Recovery does not depend upon whether lighthouse keepers (Indian Towing Company) and fire fighters (Rayonier) can be sued individually under the law of the appropriate states, but, as the Court said of the lighthouse situation in Indian Towing Company, upon general principles of "hornbook tort law," in that case upon the rule which provides that "one who un-

dertakes to warn the public of danger and thereby induces reliance must perform his 'good Samaritan' task in a careful manner." Prisoners who have received negligent medical treatment have the right under the Tort Claims Act to recovery in Illinois and elsewhere, not because prisoners in Illinois or elsewhere can or cannot sue their jailers, but because "it is hornbook tort law" that patients can recover for such negligent treatment.

**8.** 48 Stat. 8–12 (1933), amended, 57 Stat. 554–560 (1943), repealed, 71 Stat. 167, 170 (1957); 48 Stat. 524–527 (1934), amended, 62 Stat. 1219–1220 (1948), repealed, 71 Stat. 168, 171 (1957). These statutes were superseded by the Veteran's Benefits Act of 1957, 71 Stat. 83, 94 (1957), 38 U.S.C. § 301 et seq. (1958, as amended, Supp.1961).

by most workmen's compensation statutes." 340 U.S. at 144–145, 71 S.Ct. at 158. It was thought that the absence of any provision adjusting the two possible remedies was persuasive that Congress did not intend the waiver of immunity to apply to military personnel. 340 U.S. at 144, 71 S.Ct. at 158.

This point too is inapplicable to the case at bar. The relationship between the Government and federal prisoners is not "[w]ithout exception * * * governed exclusively by federal law." Federal statutes relating to the penal system provide that certain of its operations shall depend on state law. See 18 U.S.C. § 3566 (1958) (death sentence to be carried out in accordance with the law of the place where the sentence is imposed); 18 U.S.C. § 4082 (1958) (federal prisoner may, at Attorney General's option, be confined in state penitentiary). See also Rosenberg v. Carroll, 99 F.Supp. 630 (S.D.N.Y.1951); Fields v. United States, 27 App.D.C. 433, 450 (1906), cert. denied, 205 U.S. 292, 27 S.Ct. 543, 51 L.Ed. 807 (1907) (federal prisoners confined in state penitentiary are "subject to the same discipline and treatment as those sentenced in a state court").

There is no "simple, certain, and uniform" system of "compensation for the injuries or death" of federal prisoners which would evidence an intent to provide an exclusive remedy. At the time of the passage of the Act, there existed only a provision authorizing administrative compensation, without regard to fault, for injuries to federal prisoners incurred while working in prison industry. 48 Stat. 1211 (1934), as amended, 18 U.S.C. § 4126 (1958).[9] Since some prisoners are never so engaged, see Note, 63 Yale L.J. 418, 424, n. 48 (1954), and others devote only a fraction of their time to such activity, this provision covers only a very small portion of the injuries that are sustained by federal prisoners

and actually does no more than apply the principles of the Federal Employees Compensation Act [10] to federal prisoners when they are working as federal employees. As Judge HINCKS stated in his opinion, "[I]n comparison with the military compensation program, 38 U.S.C. § 700 (1958), [now § 101(13) ], which affords relief for virtually all service-incurred injuries, see 340 U.S. at 145, 71 S.Ct. 153, the prison work-compensation plan is vastly less comprehensive and is in no real sense a substitute for tort liability." [11]

4. The Court stated that since a member of the armed services has no choice whatsoever over his location, it "makes no sense * * * [t]hat the geography of an injury should select the law to be applied to his tort claims." 340 U.S. at 143, 71 S.Ct. at 158.

This consideration is, of course, equally applicable to suits by prisoners. However this argument by itself cannot be accepted as dispositive. To give it major importance one would have to believe that people who are free to move about at will are influenced in their itineraries by consideration of the law of the various states as to tort liability. A realistic appraisal of the situation would suggest that the law governing a suit for personal injury is in fact as unlikely to be a matter of free and conscious choice for others as it is for prisoners.

Although the arguments, other than the last, on which the result in Feres was rested seem highly persuasive, the Supreme Court expressed a lack of firm assurance of the correctness of its determination, stating that "[u]nder these circumstances, no conclusion can be above challenge, but if we misinterpret the Act, at least Congress possesses a ready remedy" 340 U.S. at 138, 71 S.Ct. at 155 and that "[t]here is as much statutory authority for one as for another of these conclusions" Id. at 144, 71 S.Ct. at

9. The statute was again amended in 1961. 75 Stat. 681 (1961); 18 U.S.C. § 4126 (Supp.1961), referred to infra.

10. 5 U.S.C.A. § 751 et seq.

11. Winston v. United States, 305 F.2d 257 (2d Cir. 1962). See Brooks v. United States, 337 U.S. 49, 53, 69 S.Ct. 918, 93 L.Ed. 1200 (1949).

158. These expressions of doubt must be taken as a strong warning of the impermissibility of finding exceptions to the statute in situations which do not depend upon the grounds advanced in Feres.

## IV.

■ In spite of the clarity of the language of the Act, the indications of coverage in the legislative history, and the absence of relevant authority in the Supreme Court or in this court, we are called upon to examine arguments asserted to cast doubt on the wisdom of applying the Act to prisoners, and to conclude from them that such application was not "intended." In construing the Federal Tort Claims Act, this would appear to be a course of dubious propriety because we have been instructed by the Supreme Court to give the Act a liberal construction consistent with the broad purpose underlying its enactment. See, for example, United States v. Aetna Casualty & Surety Co., 338 U.S. 366, 383, 70 S. Ct. 207, 216, 94 L.Ed. 171 (1949):

"In argument before a number of District Courts and Courts of Appeals, the Government relied upon the doctrine that statutes waiving sovereign immunity must be strictly construed. We think that the congressional attitude in passing the Tort Claims Act is more accurately reflected by Judge Cardozo's statement in Anderson v. Hayes Construction Co., 243 N.Y. 140, 147, 153 N.E. 28, 29–30: 'The exemption of the sovereign from suit involves hardship enough where consent has been withheld. We are not to add to its rigor by refinement of construction where consent has been announced.'"

See also Rayonier Inc. v. United States, supra, 352 U.S. at 320, 77 S.Ct. at 377, 1 L.Ed.2d 354; Indian Towing Co. Inc. v. United States, supra, 350 U.S. at 64–65, 76 S.Ct at 124, 100 L.Ed. 48.

However even if we were to attempt "to guess what [Congress] would have intended on a point not present to its mind, if the point had been present," [12] using as a basis our view of the wisdom or unwisdom of giving the Act its apparently intended scope, none of the arguments advanced in the original dissenting opinion, the government's argument or the decided cases, succeeds in persuading us that it is desirable to read into the statute an exception for prisoners.

■ It is suggested that the susceptibility of the Government to suit by prisoners will adversely affect prison discipline and require the courts improperly to interfere with the operation of the prison system.[13] See Sigmon v. United States, 110 F.Supp. 906, 910 (W.D.Va. 1953). We need not speculate on the question but may resort to the result of the experience with liability of prison officials in their personal capacities, see cases cited supra and Annotation, 14 A. L.R.2d 353 (1950), and direct liability where suits have been permitted under waiver of immunity statutes, see Paige v. New York, supra; Moore v. State, No. 4068, Ill.Ct.Cls. (1948), cited, 63 Yale L. J. 418, n. 52 (1954); Shields v. Durham, 118 N.C. 450, 24 S.E. 794, 36 L.R.A. 293 (1896); Hargrove v. Cocoa Beach, 96 So. 2d 130 (Sup.Ct.Fla.1957); Turner v. Peerless Ins. Co., 110 So.2d 807 (La.App. 1959). Although these situations in which prisoners recover for negligent injury have existed for many years, and although prisoners have repeatedly been successful in the courts, there is no indication that discipline has been impaired. We refer again to the statement of the House Committee considering the Act which examined New York practice un-

12. See Winston v. United States, 305 F. 2d at 259 (dissenting opinion).

13. Both the Government in its brief and the panel dissent (305 F.2d at 260) rely on Feres as support for the assertion that discipline will be impaired by potential liability, but the question of dis-cipline is not even mentioned in the opinion of the court in Feres. However, see Jefferson v. United States, 178 F.2d 518, 520 (4th Cir. 1949), aff'd sub nom., Feres v. United States, supra; United States v. Brown, 348 U.S. 110, 112, 75 S.Ct. 141, 99 L.Ed. 139 (1954).

der that state's statute waiving sovereign immunity and found that the statute had had no "detrimental or undesirable effect," notwithstanding the fact that New York had repeatedly allowed recovery by prisoners. See cases cited supra.

It is difficult, even in theory, to understand how coverage of federal prisoners by the Tort Claims Act would undermine prison discipline.[14] Prison officials are free to discipline prisoners and run the prisons as they think best. See 18 U.S.C. § 4042 (1958). Intentional torts are not cognizable under the Act, see 28 U.S.C. § 2680(h) (1958), and there can therefore be no question of the courts' reviewing affirmative acts of discipline or providing, through the possibility of resort to the courts, an incentive for resistance by prisoners. Only if injury results to a prisoner as a consequence of an act or omission, not intended to cause injury, which falls below the standard of care of a reasonable man acting in such a situation, will recovery be allowed.[15] Moreover, to an extent which it is not now necessary to examine, the exemption from liability of acts which involve the exercise of discretion will also protect against unwarranted interference with the operation of the penal system.[16]

## V.

Much is sought to be made of the lack of uniformity that will result from the incorporation by the Federal Tort Claims Act of the rules of tort law of the place of the Act. But inconsistency in the results has no special application to prisoners. It will occur in any class of suits brought under the Act.

The only bases advanced for considering non-uniformity a reason for not applying the Act are (1) that it makes "no sense" [17] to apply the law of a state that the injured person did not choose to enter, see Berman v. United States, 170 F.Supp. 107, 109 (E.D.N.Y.1959); Van Zuch v. United States, 118 F.Supp. 468, 472 (E.D.N.Y.1954), and (2) that the federal obligation to federal prisoners should be uniform, see Lack v. United States, 262 F.2d 167 (8th Cir. 1958); Jones v. United States, 249 F.2d 864 (7th Cir. 1957); Van Zuch v. United States, supra; Sigmon v. United States, 110 F. Supp. 906 (W.D.Va.1953).

(1) In enacting the Tort Claims Act, Congress had the choice of incorporating the tort law of the various states or creating a federal tort law for the sole purpose of deciding tort claims against the Government. See Richards v. United States, 369 U.S. 1, 7, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). In choosing the former, the simpler expedient was adopted. In specifying the law of the place where the act or omission occurred, Congress selected a law which had a rational relation to the incident and which the district courts were skilled in applying. But there is no evidence that the application of this law was provided because it gave the injured person an opportunity

---

14. Recent cases have indicated that the federal courts will not be deterred by substantially more persuasive considerations of discipline than are here involved from interfering with prison operations when those operations are shown to violate rights protected under federal legislation. In Sewell v. Pegelow, 291 F.2d 196 (4th Cir. 1961), the Fourth Circuit held that under the Civil Rights Act of 1871, 17 Stat. 13 (1871), 42 U.S.C.A. § 1983 (1958), federal prisoners were entitled to a trial on the merits of a complaint alleging that their rights as prisoners were being denied on account of their religion. And in Pierce v. La Vallee, 293 F.2d 233 (2d Cir. 1961), this court applied the same rule to suits in federal courts by inmates of a state penitentiary.

15. The Act provides for trial to the court sitting without a jury, 28 U.S.C. § 2402 (1958), and we may be confident that district judges in reaching conclusions on the question of negligence will be mindful of the exigencies that necessarily surround the operation of a penitentiary.

16. 28 U.S.C. § 2680(a) (1958). See Morton v. United States, 97 U.S.App.D.C. 84, 228 F.2d 431 (1955), cert. denied, 350 U.S. 975, 76 S.Ct. 452, 100 L.Ed. 845 (1956).

17. Feres v. United States, supra, 340 U.S. at 143, 71 S.Ct. at 157, 95 L.Ed. 152.

to choose the governing law.[18] Surely, if Congress had subscribed to the notion that persons plan their activities on the basis of interstate differences in tort law, and that therefore the governing law should be that "selected" by the injured person, it would have provided, in accordance with the rule followed by the vast majority of the states,[19] that liability be determined by the law of the place of injury, rather than "the law of the place where the act or omission occurred."[20] By incorporating the law of the place of the alleged negligent act or omission, Congress may have intended that the obligation of federal employees be consistent with the law of the place in which they were employed; but, whatever the purpose of the provision, it is clear that it bears no relation to any choice of applicable law by the injured person.

(2) A persuasive argument can be made for uniformity in the rights of federal prisoners for injuries negligently inflicted by prison officials. However, the same argument would support equal treatment for *all* persons injured as a result of the negligence of federal employees, and that is not the statutory scheme. Non-uniformity cannot justify an exception for prisoners when non-uniformity is expressly incorporated in a fundamental provision of the Act. There is no more reason why a prisoner should be denied recovery because under the law of some other state he might not be able to recover than there is why any other person should be denied recovery on that ground.

## VI.

Finally our attention is directed to certain instances of congressional activity and inactivity that are asserted to be relevant to the decision.

 It is suggested that Congress has, by its failure to amend the statute, ratified the results reached by lower federal courts in holding that prisoners are outside the intended scope of the Act. The repeated refusals of the Supreme Court to accept this rule of construction provide a sufficient answer to this suggestion. "It is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law." Girouard v. United States, 328 U.S. 61, 69, 66 S.Ct. 826, 830, 90 L.Ed. 1084 (1946). "[I]t would take more than legislative silence in the face of rather recent contrary decisions by lower federal courts to overcome the factors upon which we have placed reliance. * * * We do not expect Congress to make an affirmative move every time a lower court indulges in an erroneous interpretation." Jones v. Liberty Glass Co., 332 U.S. 524, 534, 68 S.Ct. 229, 234, 92 L.Ed. 142 (1947).

But it is argued that congressional *activity* in two areas subsequent to the passage of the Federal Tort Claims Act bears on the intent of the enacting Congress: (1) the passage of private relief bills for federal prisoners, with an accompanying statement that relief has been held unavailable under the Tort Claims Act, see, e. g., Priv.L.No. 773, ch. 615, 70 Stat. A124 (1956), reported, S.

---

18. In Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962), the Court noted the absence of legislative history on the choice of law aspects of the Act. 369 U.S. at 8, 82 S.Ct. at 590.

19. For a collection of cases, see Goodrich, Conflict of Laws 263–64 (1949); see also Restatement, Conflict of Laws §§ 377, 378 and 391 (1934).

20. Although the Supreme Court has recently held this language to mean the "whole law" of that place, including its conflict of law rules, Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962), it is clear that situations may occur in which the governing substantive law will be that of a state in which the plaintiff has never been present.

The Court in Richards took note of a recent tendency on the part of some states to depart from the "place of injury" choice of law rule, and consider the application of the law of a state having a greater interest in the litigation. See 369 U.S. at 12, 82 S.Ct. at 592 and cases cited in note 26.

Rep.No.1976, 84th Congress, 2d Sess. 2 (1956),[21] and (2) the passage in 1961 of legislation increasing the scope of the discretionary administrative remedy of prisoners injured in the course of prison employment, with an accompanying statement that at present the injuries sought to be included could not be otherwise compensated, see 75 Stat. 681 (1961), 18 U.S.C. § 4126 (Supp. 1961), H.Rep.No. 534, 87th Congress, 1st Sess. 2 (1961).

In Rainwater v. United States, 356 U. S. 590, 78 S.Ct. 946, 2 L.Ed.2d 996 (1958), the Supreme Court answered a similar argument based upon action of Congress with respect to earlier legislation:

"Despite its surface plausibility this argument cannot withstand analysis. At most, the 1918 amendment is merely an expression of how the 1918 Congress interpreted a statute passed by another Congress more than a half century before. Under these circumstances such interpretation has very little, if any, significance. Cf. Higgins v. Smith, 308 U.S. 473, 479–480 [60 S.Ct. 355, 84 L.Ed. 406]; United States v. Staff off, 260 U.S. 477, 480 [43 S.Ct. 197, 67 L.Ed. 358]." 356 U.S. at 593, 78 S.Ct. at 949.

See Commissioner of Internal Revenue v. Estate of Arents, 297 F.2d 894, 897 (2d Cir. 1962).

Neither the private bills nor the compensation statute was intended to alter the meaning of the Federal Tort Claims Act. Moreover, nothing presented indicates that Congress approved, rather than merely noted, the existing interpretation. The statement in the Senate Report of private law 773 that "it has been held that Federal prisoners cannot maintain such an action" (citing Van Zuch v. United States, supra, and Sigmon v. United States, supra) is a mere acknowledgment of the fact that the courts have refused to entertain such actions, and a necessary acknowledgment at that, under 2 U.S.C.A. § 190g, forbidding private bills where relief is available under the Act. The House Report on the legislation expanding coverage for injuries to prisoners engaged in prison industries noted that no alternative avenues of relief were open, a statement demonstrably true in light of the consistent course of judicial interpretation of the Act. We do not consider that the passage of this remedial legislation, which is not inconsistent in any sense with a tort remedy, should be held to eliminate a prisoner's right to sue under the Tort Claims Act, because a committee of Congress, in reliance on judicial decisions with which we cannot agree, thought that this right did not exist. Commissioner of Internal Revenue v. Estate of Arents, supra, 297 F.2d at 897.

Reversed.

KAUFMAN, Circuit Judge, whom Chief Judge LUMBARD, and Judges MOORE and FRIENDLY join (dissenting).

When this appeal was first considered by a panel of the Court, two judges were of the opinion that the Tort Claims Act permitted federal prisoners to sue the Government for injuries resulting from "operational negligence" of prison authorities, and the writer of this opinion, for reasons set forth at length in a dissent, agreed with the Government (appellee) that the Act did not permit such claims. Reconsideration of the appeal by all the active judges has done nothing to alleviate the awkwardness of such a closely divided court. A majority of five judges now concurs in the opinion delivered by the panel majority; and it also files an opinion of its own, apparently intended to answer arguments made by this writer in the dissent. On the other hand, there are now four judges who are unpersuaded by the arguments made in

21. "* * * nor is he able to recover from the United States under the Federal Tort Claims Act for his injuries, since it has been held that Federal prisoners cannot maintain such an action," S.Rep. No.1976, 84th Congress, 2d Sess. 2 (1956).

support of the majority's interpretation of the Act—as expertly and concisely stated in the first opinion, or as expanded and redefined in the second. Admittedly the majority's decision in this case is contrary to all precedent. We believe that it is also completely without foundation in legislative history; and that when viewed together with the decision rendered this day on rehearing *in banc* of Muniz v. United States, 305 F.2d 285 (2d Cir. 1962), its result is "so outlandish" that the majority's interpretation of the Act should not prevail. Brooks v. United States, 337 U.S. 49, 52–53, 69 S.Ct. 918, 93 L.Ed. 1200 (1949).

Since there is now a conflict in the Circuits, and it would seem likely that the Supreme Court will be urged to resolve the dispute, we deem it appropriate to express in some detail the reasons which lead us to reject the majority's decision. In doing this, the minority adopts the writer's earlier dissent, and undertakes herein to deal with points raised in the *in banc* decision filed today.

## I.

In the panel opinion, the majority proceeded from an assumption that the Tort Claims Act eliminated the sole barrier to prisoner actions against the Government because of its general waiver of sovereign immunity. The opinion filed today restates the same assumption, with an assertion that prisoner claims fall "squarely within the plain meaning of the Act." Moreover, since there are thirteen exceptions expressly written into the statute (none of which refers to prisoner actions), the majority states without qualification that there is "no room for the exception of additional situations which would otherwise be covered by the statute." In other words, we are told

that what Congress did not say it did not mean.

At the outset, we doubt the usefulness and wisdom of this approach to statutory interpretation, and the canon of construction upon which it rests. If it were so very clear that Congress intended to permit prisoner suits as the majority asserts, presumably its opinion would command greater support by the members of this Court; presumably also the judges of the 7th and 8th Circuits would not have decided to the contrary, and would not have persuaded District Court judges in this Circuit, as well as several others, to follow their lead.[1] Nor would a panel of this Court, including two judges of the present majority, have found those contrary decisions "persuasive analogy" in resolving another question of interpretation of this same Act. See Klein v. U. S., 268 F.2d 63, 64 (2d Cir. 1959).

The majority's categorical statement that the judiciary may not find with propriety that this particular Act contains any implied exceptions is unfounded for a still more important reason. It is contrary to Supreme Court precedent. Thus, in Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), the Supreme Court interpreted the Tort Claims Act to exclude claims by soldiers for non-combatant injuries, an exception of far greater magnitude than the one now under consideration.[2]

The question raised by this appeal is whether Congress, by virtue of a general (but not unlimited) waiver of sovereign immunity in respect of personal injuries inflicted through negligence of Government employees (e. g., injuries to pedestrians caused by accidents involving post office trucks), intended to permit suits by federal prisoners for injuries caused by negligent operation of the prisons. The precise dispute is whether the statu-

---

1. The cases are cited in the panel dissent, Winston v. United States, 305 F.2d 258 (2d Cir. 1962).

2. Similarly, the admonition that the Tort Claims Act must be given a "liberal construction consistent with the broad purpose underlying its enactment," does not

*ipso facto* answer the present question. We agree without hesitation that the statute's purpose should be effectuated by interpretation consonant with it. But "liberal" does not mean that the Act must be given unlimited scope, and that we must abandon all doubt to the contrary.

tory language, creating Government liability "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, "in accordance with the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b), necessarily requires a decision that Congress did intend to permit prisoner actions for negligence.

In support of the affirmative answer to this question, the majority argues that there are two situations in which the law of Indiana (where Winston's prison was located and the alleged acts of negligence were supposed to have taken place) recognizes private liability in "like" circumstances. The first situation concerns a physician's liability to a patient for medical malpractice.

This analogy is not unprecedented. In 1949 the Court of Appeals for the Tenth Circuit considered whether an action could be maintained under the Tort Claims Act for injuries suffered by a soldier because of negligent medical treatment administered by army surgeons.[3] A panel of that Court, one judge dissenting, found that there would be liability in the "like" circumstances of the private physician-patient relationship. In an opinion closely resembling that filed by the *in banc* majority in this case, the panel reasoned:

> "The terms of the statute are clear, and appellant's action for a money judgment based upon the negligence of army surgeons states a cause for relief under the Act, unless it falls within one of the [then existing] twelve exceptions specifically provided therein; or, unless from the context of the Act it is manifestly plain that despite the literal import of the legislative words, Congress intended to exclude from coverage civil actions on claims arising out of a Government-soldier relationship." 178 F.2d 2–3.

The court noted that soldier claims arising out of non-combatant activities were not among the specific exceptions written into the statute. In addition, it found that all but two of the eighteen tort claims bills introduced in Congress during a ten year period preceding the enactment of the Tort Claims Act specifically excluded claims by soldiers. Since Congress "conspicuously omitted to exclude" such claims, the court thought "the only logical conclusion is that it deliberately refrained from doing so"; and it held that soldier claims must be allowed, even if "the result of [the] omission to exempt such claims leads to dire consequences and absurd results * *." Id. 3.

Despite this legislative history, and the Tenth Circuit's logic, the Supreme Court did not agree that the possibility of "dire consequences and absurd results" could be dismissed so lightly. In connection with the "like" circumstances of the physician-patient relationship, the Supreme Court said:

> "It is true that if we consider relevant only a part of the circumstances and ignore the status of both the wronged and the wrongdoer * * * we find analogous private liability. In the usual civilian doctor and patient relationship, there is of course a liability for malpractice. * * * But the liability assumed by the Government here is that created by 'all the circumstances,' not that which a few of the circumstances might create." [4]

The court then considered the *other circumstances* incident to the Government-soldier relationship, and impliedly concluded that imposition of tort liability would bring about a result "so outlandish" as to reflect a "congressional purpose to leave injuries incident to service where they were, despite literal language and other considerations to the con-

---

**3.** Griggs v. United States, 178 F.2d 1 (10th Cir. 1949), reversed sub nom. Feres v. United States, supra.

**4.** Feres v. United States, supra, 340 U.S. at 142, 71 S.Ct. at 157.

trary."[5] Consequently, it held that soldier claims could not be maintained under the Tort Claims Act. Feres v. United States, supra; see also United States v. Brown, 348 U.S. 110, 112, 75 S.Ct. 141, 99 L.Ed. 139 (1954). We believe circumstances surrounding the Government-prisoner relationship similar to those existing in Feres require the same result in this case. At the very minimum, however, it would seem clear that Feres precludes a decision that *merely* because a patient can sue his physician for malpractice in Indiana, a prisoner must be given a like remedy under the Act.

The second "like" situation noted by the majority in which Indiana creates analogous private liability involves the right of an inmate to sue a jailer *in his private capacity* for negligence causing injury. Regardless of the problems created by a scheme of Government liability made to depend on state recognition of jailer liability,[6] this analogous "private" situation, under the Feres doctrine, is also but one factor to be considered in deciding whether there are "like" circumstances which render the Government liable. The mere existence of state recognized private liability in the jailer-inmate situation is not controlling for the same reason physician liability to a patient is not. In neither case is there *parallel* private liability.[7] Other important circumstances peculiar to the Government-prisoner relationship must be considered.

## II.

The majority opinion examines the Feres opinion in some detail, and concludes that the "other circumstances" which led the Supreme Court to exclude soldier claims from the coverage of Tort Claims Act despite (a) certain similarities to "like" situations in which private liability is recognized, (b) legislative history indicating deliberate omission of such an exception, and (c) literal import of the statutory language, are not present in this case.

The Supreme Court has indicated with indisputable clarity that the Feres decision must be explained in terms of the:

"* * * peculiar and special relationship of the soldier to his superiors, *the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits under the Tort Claims Act* were allowed for negligent orders given or negligent acts committed in the course of military duty * * *" (Italics added.)[8]

Although considerations of discipline applicable to the Government-soldier relationship would seem to apply *a fortiori* to the Government-prisoner relationship, and extreme results might obtain if suits are allowed, the majority believes that Feres "does not require" a conclusion different from that which it has reached. This is because, initially the majority conceives of no reason why prison discipline should be adversely affected if the Government is made susceptible to prisoner actions. "We need not speculate" on that question, it says, because we have resort to the experience of states which permit similar actions, and "there is no indication that discipline has been impaired" in those states.

A threshold objection to this treatment of a difficult policy question is that state experience with statutes waiving sovereign immunity, especially as it relates to the particular matter of prisoner claims, is not a reliable indication of what the federal experience will be with such claims. It is not unreasonable to sup-

5. Brooks v. United States, supra, 337 U.S. at 53, 69 S.Ct. at 920.

6. See 280, infra.

7. Moreover, not all states which recognize jailer liability impose liability on a supervisory employee, e. g., a sheriff, for acts of a subordinate—the parallel private liability to which the Act might refer. See Annotation, 14 A.L.R.2d 353, 359 (1950).

8. United States v. Brown, supra; Feres v. United States, supra, 340 U.S. at 146, 71 S.Ct. at 159.

pose that the federal and state prison populations differ substantially, owing to considerable differences in the nature of federal and state penal laws. Undoubtedly there are also marked differences between state and federal prison facilities and in the methods employed in the operation of the prison system which are pertinent to our inquiry. And in some states the doctrine of "civil death" operates to prevent prisoners from suing *while* they are in prison, although sovereign immunity does not bar actions brought after their release. Since this is true in New York, N.Y.Penal Law, McKinney's Consol.Laws, c. 40, § 510; Green v. State, 278 N.Y. 15, 14 N.E.2d 833 (1938), affirming 251 App.Div. 108, 295 N.Y.S. 672 (4th Dept. 1937), reversing 160 Misc. 398, 290 N.Y.S. 36 (Ct.Cl. 1936); Glena v. State, 207 Misc. 776, 138 N.Y.S.2d 857 (Ct.Cl.1955), the New York "experience" with prisoner actions and prisoner discipline upon which the majority relies is no sure guide to the anticipated federal experience with actions brought by prisoners *while* they are confined, unimpeded by theories of "civil death." See Coffin v. Reichard, 143 F. 2d 443, 155 A.L.R. 143 (6th Cir. 1944), cert. denied, 325 U.S. 887, 65 S.Ct. 1568, 89 L.Ed. 2001 (1945); Note, 63 Yale L. J. 418 (1954). It is not difficult to foresee the use to which this remedy will be put by men anxious to relieve the monotony of prison life with the excitement of trials involving their guards and wardens. And it does not strain the imagination to recognize the encouragement these jaunts to the courthouse will have to the proliferation of this type of litigation no matter how lacking in merit the claims may be. What is to become of discipline if the Bureau of Prisons is required to shuttle prisoners back and forth? Indeed, the enactment of 28 U. S.C. § 2255 in place of habeas corpus in criminal proceedings (for federal prisoners) was prompted in the main by this important consideration. The court's inability to investigate such questions, and the many possible differences between state and federal experience in this area, weighed heavily in this writer's earlier dissent—in which I proposed that Congress, with its ample fact finding facilities, should be given the opportunity to undertake an extensive investigation into this matter.[9] See Winston v. U. S., supra, at 274, n. 1.

9. The imposition of liability on the Government for the negligent injury of a prisoner before Congress has had an opportunity to explore how much litigation will flow from its own penurious nature in not providing sufficient funds for the operation of old penal institutions and for the construction of new ones is a dangerous adventure. From an article by James V. Bennett, Director of the Federal Bureau of Prisons for more than 25 years and long recognized as one of the leading and most progressive prison administrators in the country we learn:

"The prisoners in Federal institutions have increased by 35 per cent during the postwar period * * *

"* * * [B]ut the courts continue to send men to prison in an ever-engulfing stream. The administrator must find the space somehow. In our Atlanta penitentiary eight and ten men are now occupying cells intended for four. The single cells each hold two men. Beds are strung closely together in dingy basement areas. And prisoners still arrive daily.

"Although the prison warden may find a place, however unsatisfactory, for the prisoners to sleep, the rest of the prison facilities fall hopelessly behind. Men stand in line at the toilets and washbowls. They go to the dining room in shifts; the dining room of the Atlanta penitentiary is in continuous use throughout the day. But the effects of overcrowding are even more destructive in terms of the prison's purpose in salvaging men. The classrooms cannot accommodate all the men who need even basic education. The shops, industries, and maintenance work of an overcrowded prison cannot provide jobs for all.

"Overcrowding means idleness, and in some prisons as many as fifty per cent of the prisoners can only sit vacantly in their cells or mill aimlessly in the prison yard. What should be a time for preparation in anticipation of a fresh start in life turns out instead to be a stultifying, soul-deadening interim. And yet the prison warden is told, when such men leave prison and return again to crime, 'You failed to rehabilitate them!' The warden was never given a chance.

"Most of the wardens I know are charged with running an overcrowded prison.

A second objection is that we really have no idea what the state experience has been with these statutes, and with prisoner claims in particular. Reports of cases involving prisoner actions give no indication of the effect which the right to sue the state has on the administration of discipline in the correctional institutions involved. Moreover, the majority cannot derive evidence of state experience from a statement found in House Report 1287, which accompanied the bill (as incorporated into the Legislative Reorganization Act) later enacted as the Tort Claims Act, that there were no indications of "detrimental or undesirable" effects from state laws waiving sovereign immunity.[10] That statement was intended as a generalization of the experience of "a number" of states with general waiver of immunity laws. The Committee certainly was not saying that laws waiving sovereign immunity had no undesirable effects whatever. Furthermore, as we shall demonstrate in connection with another point,[11] it is interesting that the Report also referred to states that did *not* permit prisoner actions, although they did permit the normal run of negligence litigation by *other* persons.

A third objection, closely related to the previous two, is that the experience of various states permitting prisoner claims is not alike; and the majority has no expertise by which to decide which of several states' experiences is relevant to the federal situation.

Finally, it is significant that the majority chooses to dismiss the Government's fears concerning prison discipline in a situation involving nothing more than a failure of prison medical authorities to diagnose a disease (the gravity of which was unknown to the prisoner), rather than in the situation posed by Muniz v. United States, supra, a companion case decided this day on rehearing. In Muniz (decided by reference to the Winston opinions), the facts plainly demonstrate that the Government's fears are not wholly fanciful. Muniz claims that prison authorities operated his institution negligently in countless ways, which resulted in general unrest among the inmates leading to a riot in which he was injured. The complaint also alleges that prison guards negligently executed riot control procedures, leaving Muniz at the mercy of rioting inmates anxious for an opportunity to "take care" of him. A more vivid illustration of the extent to which a judge will be called upon to review every phase of prison administration under the present decision can hardly be imagined. Wholly aside from the burden placed upon the Government in defending this action,[12] if the

And most of the wardens I know are nervous men. They pace the floor in their offices. They order the steward to put more meat in the stew. They tour the prison daily, and concealing their anxiety, search the faces of the men.

"*With the aid of their skimpy staffs, they can try only to keep the lid on. But experience tells them it is only a matter of time. It may be today, or tomorrow. It is no accident that the decade of the 1950's has seen the most overcrowding in the history of American prisons—and also the most unrest, violence and disorder among American prisoners. In the first three years of the decade there were more destructive prison riots than in the previous fifty years. The unrest broke out again in 1959, raged for a time, and then subsided.*

"American prison systems are now trying desperately to construct enough new facilities to contain and treat the mounting prisoner populations. But the present rate of prison commitments suggests that the effort is not enough. Prison populations continue to multiply faster than prison facilities. Despite a rise in the number of prisoners that should warrant the construction of a new institution annually, the Federal Prison System for example has been authorized only one new institution since 1940." Bennett, Of Prisons and Justice (1961).

10. The text of the Report, insofar as it deals with state legislation, is set forth infra at p. 283.

11. See p. 284, infra.

12. Will prison guards, like traffic policemen, spend a substantial portion of their time in courts as witnesses if the majority view prevails?

court finds that the prison's failure to conduct its affairs in a manner conforming to the court's notion of due care [13] led to an unreasonable risk of riot and injury to Muniz, must the prison authorities revise their manner of operation accordingly, or risk further costly litigation, although they disagree with the court's theory of "due care" on the basis of their own experience and expertise? [14] And there were approximately 1000 assaults (inmate on inmate) in federal prisons during 1961. 3 Bureau of Prisons (Dept. of Justice), Basic Data 49 (revised ed. Dec. 1961).

We believe the majority does not comprehend the magnitude of the problem because it fails to recognize the distinctly unique situation caused by the confinement of human beings. Professors, sociologists, and penologists have reminded us of the tension-packed atmosphere which exists in prisons:

" * * * [T]he vaunted loyalties of men in prison are apt to be nonexistent; exploitation rather than cooperation is the rule, since the conditions of a viable solidarity are missing. Faced with severe frustrations, together but yet apart, and ill-equipped by previous experience to live in harmony under compression, the inmates of the prison attempt to manipulate their captors, coerce and defraud each other, or withdraw into the sullen apathy of 'sweating out their time.' " Sykes, Crime and Society 112 (Princeton, 1956).[15]

How then can the court under these circumstances thrust liability on the Government before Congress has had an opportunity to examine the nature and extent of that liability?

Turning to the other circumstances which persuaded the Supreme Court in Feres that soldier claims were not meant to be included in the coverage of the Tort Claims Act, the majority recalls that Court's reluctance to believe that Congress intended to make Government liability contingent upon state law since the Government-soldier relationship is "distinctly federal" in nature. Interpreting

13. If state law is to be applied, does this mean that state standards of due care are also to be used? If Georgia and Kansas have a guard ratio of 10 to 1, is it *prima facie* negligence for Atlanta and Leavenworth to have, e. g., a 30 to 1 ratio?

14. "We have confined in our prisons those who have been members of gangs on the outside, those who have raped, assaulted or killed, and those who simply stole cars or perhaps a letter from the mailbox. *We have not found it possible to devise a system that will assimilate all these people into a compatible community wholly free of discord and occasional violence.* It is my feeling that since we have in such populations men who are chronic agitators, religious fanatics * *, and people attempting to endure unbearably long sentences, that we cannot expect to avoid occasional violence. Principal problems with assault cases involve those who have testified in court against other prisoners and thus need protection against bodily harm; supervision, separation and protection of sexual problem cases and gamblers who become involved and heavily indebted to fellow prisoners. We have had a considerable measure of success in holding such incidents to a minimum. Inmates are confronted by a sense of injustice and frustration, hopelessness for the future, sexual deprivations, and heavily laden tension factors which tend to produce violence in seemingly trivial situations. *It is my honest opinion that prison officials can no more be guilty of inefficiency when disturbances or instances of violence occur than are outside law enforcement agencies when banks are robbed, people are consulted and stabbings occur on Saturday night. A prison community is made up of people who came from these outside situations.*" Wilkinson, Assistant Director U. S. Bureau of Prisons, Report, Protection and Control of Prisoners (1962). (Italics added.)

15. "Various kinds of riots and disturbances provide a more or less constant threat to established order within an institutional setting. Among those most frequently noted are mass escape attempts, sitdowns and other peaceful demonstrations, group assaults against certain officers or inmates, self-inflicted injuries and suicides, and expressions of violent rage against oppressive conditions." Schrag, The Sociology of Prison Riots, 148 (1960).

this to mean that relationship does not "in any sense depend on the operation of state law," the majority finds this consideration "inapplicable to the case at bar," because statutes relating to the penal system "provide that certain of its operations shall depend on state law." We think the majority misreads the reference made to the "distinctively federal" Government-soldier relationship in Feres. As the quotation from United States v. Standard Oil Co. of California, 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947) on page 143 of 340 U.S., on page 157 of 71 S.Ct. of Feres makes clear, the Supreme Court was merely indicating that *fundamentally* the source of all law governing that relationship is federal. The court was not suggesting that Congress has never "applied" state law (in the sense of adopting state rules) to certain incidents of the relationship. In fact, Article 134 of the Uniform Code of Military Justice, 10 U.S.C.A. § 934, does make provision for application of state law to some incidents of the Government-soldier relationship. See Assimilative Crimes Act, 18 U.S.C. § 13; Snedeker, Military Justice 183, 184 (1953). The application of state law to the Government-prisoner relationship referred to by the majority is of the same order. In neither situation does this practice render the relationship less distinctively federal in nature. Thus, insofar as the Supreme Court was reluctant to find that Congress intended to make Government liability depend on state law in Feres, the considerations are equally applicable here.

The majority admits that the Supreme Court's statement that it "makes no sense" to provide that geography should select the applicable law governing liability for injuries sustained by a soldier —who may be stationed anywhere at the will of his superior officers, is equally applicable to the prisoner situation. But the majority finds this argument unpersuasive because no one chooses his location because of the relative merits of a particular state's tort law. If the Supreme Court was concerned with the soldier's lack of "choice," its argument would not be persuasive. But we believe the Supreme Court was referring to something else.

When Congress was deliberating over the Tort Claims Act, it was faced with the troublesome question whether it was necessary to construct an entire body of federal negligence law, or whether it would be unjust to claimants to take the easier course, and allow Government liability to be determined according to the existing reservoir of state law. Since a person normally looks to that state law for a definition of his rights against all other persons, Congress probably thought that it would not be unfair if he were allowed to recover for federal government negligence "in the same manner and to the same extent" as he could recover against any other tortfeasor. Apparently Congress preferred the advantages of applying state law to other considerations which suggest the desirability of a uniform federal obligation for the tortious acts of its employees.

However, as explained in this writer's earlier dissent,[16] this notion of "fairness" is not applicable in the case of soldiers or prisoners because the Government directs them to reside in a jurisdiction which it chooses. Thus, the Government is in a position to control the state law applicable to injuries which it may negligently inflict. It is this factor which undoubtedly led the Supreme Court to declare it "makes no sense" to provide that a soldier's right to recover for his injuries should depend on geographical circumstances—which the tortfeasor controls. The inherent difficulties and morale problems which this creates in the operation of a system devised for the benefit of victims of Government negligence which is supposed to operate with equality, persuaded the Supreme Court, in addition to other considerations, that Congress did not intend such a result.

16. Winston v. United States, supra, 305 F.2d 274, n. 1.

And this applies with no less force to prisoners.

Furthermore, the majority's argument that inequality which results from application of various state laws is no more disadvantageous to a prisoner than to anyone else is unconvincing. It would seem that all states recognize private liability in almost all situations in which a person may be injured as a result of the federal Government's "operational negligence," so that the Government will also be liable. But the Government's liability to prisoners, under the rationale of the majority opinion, depends upon the existence of jailer liability in the state where the prison is located. In many states such liability is not recognized. See Annotation, 14 A.L.R.2d 353, 356 (1950). As a practical matter, this means that the right of a federal prisoner to recover is made dependent upon the magnanimity of the Director of Prisons, who decides whether a prisoner will be confined in a particular state.

The strange result which occurs in a state that does not recognize jailer liability, but does permit suits against the sovereign, provides further indication that Congress did not intend to make prisoner claims subject to the Tort Claims Act. For in such a state, e. g., Illinois [17] federal prisoners [18] will have no remedy against the Government, although state prisoners have a remedy against the state.[19] It is difficult to perceive how this result can be avoided, unless the courts are willing to consider a state as a "private person," within the meaning of sections 2674 and 1346(b). If that interpretation is adopted the federal government will be liable "in the same manner and to the same extent" as state governments—a result unlikely to have been intended by Congress.

Finally, the majority notes that the Supreme Court in Feres was impressed by the fact that a comprehensive scheme of compensation (regardless of fault) existed for the benefit of soldiers, and that the Tort Claims Act failed to contain any provision adjusting it to the tort remedies it created. Since the compensation system for prisoners was more limited than that provided for soldiers in 1946, when the Tort Claims Act was passed (although the prisoner compensation system has been expanded considerably by recent legislation), the majority argues that the lack of any such provision cannot be as significant here as it was in Feres and that insofar as prisoners are concerned, the tort and compensation remedies are meant to be cumulative. But in groping for this straw, which the Supreme Court hesitated to rely on, see Feres v. United States, supra, 340 U.S. at 144, 71 S.Ct. at 158, the majority overlooks the Supreme Court's emphasis on the particular suitability of an administrative compensation scheme to the military situation:

"A soldier is at peculiar disadvantage in litigation. Lack of time and money, the difficulty if not impossibility of procuring witnesses, are only a few of the factors working to his disadvantage." Id. at 145, 71 S. Ct. at 158.

This is certainly no less true of the prisoner, who, in addition to financial handicaps affecting his ability to maintain a successful civil action, is likely to suffer disadvantages because of his status and the nature of his complaint. If the prison authorities will not permit a prisoner to leave his institution even when his case is reached for trial, in order to avoid the discipline problems previously discussed, supra, at page 276,[20] he will face a major handicap be-

17. Bush v. Babb, 23 Ill.App.2d 285, 162 N.E.2d 594 (Ill.App.Ct.1959); see Note, 63 Yale L.J. 418, 422 n. 37.

18. There is a federal prison in Marion, Illinois.

19. Moore v. State, No. 4068, Ill.Ct.Cl. (1948).

20. This may not be the case if judges issue writs of habeas corpus to secure their presence at trial. If they do, then we will encounter the discipline and administrative problems envisioned, supra, at page 276.

cause of his inability to give testimony in court on his own behalf. He will then have to fall back on the use of his own deposition to establish his case. We are sophisticated enough to know that his deposition testimony is not an adequate substitute for his appearance on the witness stand. Any experienced trial judge will attest to the truism that nothing can take the place of the plaintiff's graphic demonstration of the extent of his injuries. Furthermore, we must recognize that the prisoner under these circumstances will be required to rely entirely on his attorney who is deprived of his client's ready assistance in preparation for trial and his aid during the trial. We believe that considerations such as these, which indicate that an administrative compensation scheme may be the only way to provide a prisoner with adequate relief, lend considerable support to our position that Congress never intended that the Tort Claims Act would extend to prisoner claims.

Of course, we do not suggest that the considerations which persuaded the Supreme Court to exclude soldiers from coverage of the Act are *identical* to those relevant in the instant case involving prisoners. But, the considerations are so similar that Feres has been held to control, by analogy, in decisions by the two other Courts of Appeals that have passed on the issue. When it is recalled the Supreme Court found that Congress did not intend to include soldier claims (a) despite the fact that in almost all of the bills proposing tort claims legislation submitted before the enactment of the present law there were provisions expressly excluding soldier claims—a strong indication of deliberate omission of a similar provision in the enacted statute; and (b) despite the fact that Congress did expressly exclude *some* claims by servicemen, 28 U.S.C. § 2680 (j), the similarity with the Feres case should be dispositive here where there is no indication of such legislative history concerning prisoners.

It seems to us that the majority's argument, in essence, is not that Feres lacks similarity to the present case, but that subsequent cases construing the Act, have cast doubt on its value as precedent. Thus, it is said that "expressions of doubt" found in the Feres opinion ("[u]nder these circumstances, no conclusion can be above challenge * * *") must be interpreted as "a strong warning of the impermissibility of finding exceptions to the statute * * which do not depend upon the grounds advanced in Feres."

But Feres indicates no such principle of construction. It established the principle that despite the doctrine of *expressio unius est exclusio alterius* relied upon by the majority, sound jurisprudence may require a conclusion that there are implied exceptions. There is nothing in Feres which suggests that sound jurisprudence may not take into account other compelling circumstances of a particular case, unless they are identical with the circumstances existing in Feres. To be sure, subsequent Supreme Court decisions demonstrate no readiness to create exceptions with abandon. But in Rayonier Inc. v. United States, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957) (forest fire fighters) and in Indian Towing Co., Inc. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) (lighthouse keepers), the Supreme Court dealt with situations in which parallel "private" liability was obvious, and in which no compelling circumstances required a judicially implied exception as in Feres, or the exception which we believe necessary in the instant case.

III.

Is there any legislative history, however remote, which indicates that Congress intended to include prisoner claims within the scope of the Tort Claims Act? The first opinion offered none. The second opinion, however, referring to a New York statute waiving sovereign immunity, and to New York "practice" which permits prisoner actions against the state, suggests that there is evidence which "tends to support a broad application of the Act and, more specifically,

the coverage of federal prisoners." The *in banc* opinion states:

"The House Report on the Federal Tort Claims Act * * * took express note of the New York statute and of the state's experience with it and concluded that '[s]uch legislation does not appear to have had any detrimental or undesirable effect.' "²¹

The majority, alluding to a sentence in which the Committee notes that the New York statute was different from the proposed federal bill in several respects, concludes that the Committee meant to convey an impression that "in all other respects the New York legislation was the same * * *" and that:

"Since the House Committee examined the practice under the New York law, and made no exception for claims by prisoners, it may safely be assumed that the intent was to encompass such claims."

We believe that this assumption is not only unsafe, but that it is demonstrably erroneous.

House Report No. 1287, insofar as it deals with existing state law, reads as follows:

"STATE LAWS

"It is pertinent to note in this connection that a number of the States have waived their governmental immunity against suit in respect to tort claims and permit suits in tort to be brought against themselves. Such legislation does not appear to have had any detrimental or undesirable effect. Thus, the State of New York, in 1929, by an act of its legislature explicitly waived its immunity from liability for the torts of its officers and employees and consented that its liability for such torts be determined in accordance with the same rules of law as apply to an action against an individual or a corporation. That State legisla-

tion went much further than the pending bill, because no exception to liability and no maximum limitation on amount of recovery was prescribed (Laws of New York, 1929, ch. 467).

"In 1893 the Legislature of California enacted a statute permitting suits to be brought against the State on claims on contract or for negligence (California Statutes 1893, ch. 45, sec. 1, p. 57 [West's Ann.Gov.Code, § 16041]).

"In 1917 Illinois permitted its court of claims to pass on all claims and demands, legal and equitable, ex contractu and ex delicto 'which the State as a sovereign commonwealth should in equity and good conscience discharge and pay' (Laws of Illinois, 1917, ch. 325 [S.H.A. ch. 37, § 432]).

"In Arizona, in 1912—its first year of statehood—a statute was enacted authorizing suits to be brought against the State on claims in contract or for negligence (Arizona Laws of 1912, art. I, ch. 59 [A.R.S. § 12–821 et seq.])."

It seems self evident that the Committee's purpose in making the above reference to existing state law was threefold:

1. to indicate that "a number" of states had already passed general statutes waiving sovereign immunity in respect of tort claims;

2. to express its judgment that, taken as a whole, such legislation did not appear to have been undesirable; and

3. to give several examples of existing legislation, including the statutes found in three of our most populated states (N. Y., Ill., Cal.) and a statute in one of the least populated (Arizona); and to point out that the proposed federal bill did not even approach the New York statute in the extent of waiver, although it did adopt

21. Even the appellant Winston does not argue that the Committee examined the New York "practice," suggesting only that

it "must have been aware" of New York decisions interpreting the statute (Br. 6).

the New York (and common law) rule that Government liability would be determined by rules of law applicable to private persons.

The reference to state legislation was general. No attempt was made to compare the four illustrative statutes, or to examine particular provisions. No reference was made to judicial decisions construing any of the statutes; and we believe none is implied.

More particularly, the Report does not refer to any New York provision expressly permitting prisoner claims (for there was none), or to judicial decisions construing the general New York statute to permit them. In short, there is no language substantiating the majority's assertion that the Committee "took express note of the state's * * * experience" with prisoner claims; and there is not even the slightest indication that the Committee was aware of this New York "practice." Of course, if the Committee was not aware of the practice, there is no basis for the majority's conclusion that the proposed bill intended to "encompass" such claims.

Moreover, we note that the Report did not refer merely to the New York statute, but to statutes in Arizona, California and Illinois; and that the reference to the New York statute was the same as that made to the others. It is clear that Arizona and California have at no time permitted prisoners to sue those states for the negligence of prison authorities, despite their statutes waiving sovereign immunity. See City of Phoenix v. Lane, 76 Ariz. 240, 263 P.2d 302 (1953), overruled on other grounds, Lindsey v. Duncan, 88 Ariz. 289, 356 P.2d 392 (1960); State v. Sharp, 21 Ariz. 424, 189 P. 631 (1920); People v. Superior Court of City and County of San Francisco, 29 Cal.2d 754, 178 P.2d 1, 40 A.L.R.2d 919 (1947) (in banc) (state not liable for negligence of employees engaged in pure-

ly governmental functions); Grove v. County of San Joaquin, 156 Cal.App.2d 808, 320 P.2d 161 (Dist.Ct.App.1958); Collenburg v. County of Los Angeles, 150 Cal.App.2d 795, 310 P.2d 989 (Dist.Ct. App.1957); Bryant v. County of Monterey, 125 Cal.App.2d 470, 270 P.2d 897 (Dist.Ct.App.1954); Oppenheimer v. City of Los Angeles, 104 Cal.App.2d 545, 232 P.2d 26 (Dist.Ct.App.1951) (operation of jail, prison or reformatory is a purely governmental function). Therefore, if we assume, as the majority does, that the Committee was aware of the New York "practice," it must have been equally aware of the Arizona and California "practices." It is inconceivable that the Committee intended to incorporate both into the federal bill. And it would seem that if the Committee was aware of the conflicting "practices" and meant to adopt the New York-Illinois approach rather than that of Arizona and California, it would have made this choice clear in its Report.[22]

## IV.

The majority is unimpressed by the fact that Congress continues to pass private bills for the relief of injured prisoners. The panel opinion dismissed this practice on the theory that private bills are "passed out of courtesy to the sponsoring Congressman without the deliberation attending the passage of a Public Law." The in banc majority suggests that the bills represent nothing more than a congressional "acknowledgment of the fact that the courts have refused to entertain" prisoner actions; and it maintains that "nothing presented indicates that Congress approved, rather than merely noted, the existing interpretation."

However, we note that when Congress adopted the Tort Claims Act, it simultaneously enacted another statute prohibiting any "private bill or resolution * * * authorizing or directing (1) the

22. If the Committee was *not* aware of these "practices," and as we have already suggested there is no indication that it was, it cannot be seriously argued that by failing to write an express "prisoner exception" into the bill, the Committee indicated that it meant to adopt the New York rule.

payment of money * * . * for personal injuries or death for which suit may be instituted under the Federal Tort Claims Act * * * " 2 U.S.C.A. § 190g. Presumably, this legislation prohibits the House Committee on the Judiciary from introducing the proscribed private legislation "out of courtesy" to Congressmen; and theoretically, it would seem that Congress has forbidden itself to pass such bills. Otherwise, section 190g would appear to be meaningless. Yet private bills for injured prisoners are still processed in unabated number. See Winston v. United States, supra, 305 F.2d 274 n. 1, at 279 n. 14 (dissent). A reason given by the Committee for this is that "there is no way under the general law to compensate prisoners" who are injured. H. Rep. 534, cited in Winston v. U. S., supra. And in proposing Private Law 773, id. at 263 n. 18, the Committee referred to lower court opinions holding that prisoner claims may not be brought under the Tort Claims Act.

Although the majority asserts that this is a "necessary acknowledgment" because of section 190g, it is not clear what that statement means. Certainly the majority does not mean that when the Committee proposed Private Law 773, for example, it viewed two brief decisions by district judges in Tennessee and New York as constituting a definitive and final interpretation of the Act which it was bound to follow. The majority, by disregarding the unanimous decisions of no less, than 12 trial and appellate courts, amply demonstrates that *it* is not bound by considerably more authoritative precedent. Therefore, unless we are willing to assume that the House Judiciary Committee referred to those decisions *pro forma*, in order to evade section 190g, it would seem that the Committee's action must be taken as an indication of its agreement with the courts' interpretation of the Act. Moreover, if the Committee did not agree with the decisions, it is difficult to understand why it proposes, and Congress continues to pass these private bills. And since this Committee proposed the Tort Claims Act in 1946,

and has since been charged with the duty of processing private legislation in accordance with the 1946 legislative scheme, we think its interpretation of the Act is worthy of note.

Although the majority would ignore this "subsequent legislative intention," we think that in the absence of any shred of legislative evidence to the contrary, it should be considered, together with other circumstances previously discussed, as substantial evidence that the Tort Claims Act was generally understood to exclude prisoner claims. As the Supreme Court said in Feres:

"Under these circumstances, no conclusion can be above challenge, but if we misinterpret the Act, at least Congress possesses a ready remedy." 340 U.S. 138, 71 S.Ct. 155.

We would affirm.